**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE AT&T MOBILITY WIRELESS | ) | |
| DATA SERVICES SALES TAX | ) | MDL No. 2147 |
| LITIGATION | ) | No. 10 C 2278 |
| | ) | Hon. Amy J. St. Eve |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

This consolidated class action arises from numerous cases brought against AT&T

Mobility, L.L.C. ("AT&T"), for its collection of certain state and local taxes in alleged violation

of the Internet Tax Freedom Act ("ITFA").  The U.S. Judicial Panel on Multidistrict Litigation

("the JPML") centralized twenty-eight actions against AT&T pursuant to 28 U.S.C. § 1408 in

this Court.  (R. 1.)  On June 24, 2010, Plaintiffs filed their Consolidated Master Class Action

Complaint.  (R. 48.)  On August 11, 2010, the Court granted in large part the parties' joint

motion for class certification, preliminary approval of class settlement, approval of notice, and

appointment of notice administrator.[1]  (R. 96.)  Since then, the parties have filed memoranda in

support of their motion for final approval of the class-action settlement, and a number of

objectors (as well as certain states) have filed briefs in opposition to the Settlement Agreement

("the Agreement" or "the Settlement").  The Court held a fairness hearing on March 10, 2011,

and allowed further time for amici to file briefs.  (R. 169.)

Having studied the Agreement and the relevant briefing, the Court grants the motion for

---

[1] The Court reserved judgment on whether to appoint Analysis Research Planning
Corporation ("ARPC") as settlement administrator.  (R. 96 at 1.)  The Court subsequently
granted Class Counsel's motion for appointment of ARPC as interim settlement administrator on
January 7, 2011.  (R. 121; R. 122.)

final approval of the Settlement (R. 154), finding that it is fair, reasonable, and adequate.  The Court will address in a separate order Class Counsel's motion for approval of attorneys' fees, costs and expenses, and for approval of incentive awards for class representatives (R. 124).

## BACKGROUND

### I.  The History of the Litigation

The ITFA provides that no state shall impose taxes on Internet access, or multiple or discriminatory taxes on electronic commerce, beginning November 1, 2003, and ending November 1, 2014.  47 U.S.C. § 151 (1998) (as amended).  AT&T remitted a variety of sales and use taxes to certain state and local taxing authorities, which led numerous plaintiffs, who contended that the ITFA forbade such taxes, to bring suit.  (R. 156 at 15.)  AT&T subsequently moved under 28 U.S.C. § 1407 to transfer those actions for consolidated proceedings.  (R. 1 at 1.)  On April 7, 2010, the JPML transferred the cases to this Court, but declined to transfer the single case of *Johnson v. AT&T*, No. 4:09-CV-4014.  (*Id.* at 3-7.)  Plaintiffs in the *Wiand* action pending in the Eastern District of Michigan and the *Johnson* action pending in the Southern District of Texas opposed inclusion of their actions in centralized proceedings.  (*Id.* at 1.)

The JPML carefully considered certain Plaintiffs' arguments that the application of the ITFA will vary from state to state and that centralization could have the negative effect of allowing AT&T later to argue against class certification based on the distinct tax rules of each state.  (R. 1 at 2.)  Nevertheless, the panel concluded that "the benefits of centralization are significant," and thus found that the relevant actions met the requirements of 28 U.S.C. § 1407.  The JPML determined, however, that the *Johnson* action was sufficiently distinct to warrant exclusion from the centralized proceedings.  (*Id.*)

On June 24, 2010, AT&T and 57 plaintiffs in the consolidated actions filed a joint motion for an order certifying the proposed class and subclasses for settlement purposes, preliminarily approving the settlement agreement, approving the notice plan, ordering the dissemination of notice as set out in the Settlement Agreement, and appointing Analysis Research Planning Corporation ("ARPC") as the Notice and Settlement Administrator. (R. 49.) On August 11, 2010, the Court granted the joint motion for class certification, preliminary approval of class settlement, approval of notice, and appointment of notice administrator, but reserved judgment on whether to appoint ARPC as settlement administrator. (R. 96.)

In preliminarily approving the Settlement Agreement, the Court weighed the strength of Plaintiffs' case against that of AT&T. (R. 97 at 20-24.) It observed that Plaintiffs' action faces "significant hurdles," but noted that AT&T had agreed for the purpose of the proposed settlement not to argue that (1) Plaintiffs must arbitrate their claims; (2) the Court cannot certify the proposed class; (3) Plaintiffs lack standing; (4) the ITFA does not preempt the relevant taxes; and (5) the voluntary-payment doctrine bars Plaintiffs' claims. (*Id.* at 21.) The Court further observed the relevance of discounting to present value, which means that, even if the Plaintiffs were ultimately to prevail in the future, a dollar then would not be equivalent to a dollar now. (*Id.* at 21-22.) This constituted a benefit to the Proposed Settlement, which would provide immediate benefits. (*Id.* at 22.) In addition, the Court noted AT&T's agreement that it would stop collecting taxes on Internet-access services within 30 days of the Court's preliminary approval. (*Id.*)

Further benefits to class members as a result of the Agreement involved AT&T's creation of an escrow account and coordination of tax refunds and credits without requiring class

members to submit any claim forms. (*Id.*) Within 90 days of preliminary approval of the

Settlement Agreement, AT&T had to begin filing refund and credit applications. (*Id.*) The

Court also observed the creation of state-specific subclass accounts, which would facilitate

recovery in light of different states' distinct procedures for allowing refunds. (*Id.* at 22-23.) In

addition, AT&T agreed to waive its opposition to class certification and to pay the cost of

notifying the class. (*Id.* at 23.) The Court concluded its discussion of the relative strengths of

the parties' cases by observing:

> Movants have represented that hundreds of millions of dollars are at issue in this
> action, but they have not provided a more-definite figure of how much is at issue
> or exactly how much Plaintiffs can expect to recover. That is not problematic at
> this stage, however, because it appears that Plaintiffs would receive a high
> percentage of what is at issue – whatever that dollar value may be – under the
> Proposed Settlement Agreement. As such, this factor favors preliminary
> approval.

(*Id.* at 24.)

The likely complexity, length, and expense of litigation favored granting preliminary

approval of the Settlement because AT&T's service agreements contain mandatory arbitration

clauses. (*Id.* at 25-26.) In relying on the opinion of AT&T's counsel and the Interim Settlement

Class Counsel, the Court deemed it relevant that "class counsel will only be paid from state-

specific escrow accounts if those accounts are funded through refunds or credits from the taxing

jurisdictions, and they have agreed to seek fees that are no greater than the lesser of ten percent

of the aggregate value of the settlement or twenty-five percent of the aggregate value of the class

damages actually recovered." (*Id.* at 26-27.)

Although formal discovery had not taken place, that fact alone did not preclude approval

of the Settlement in light of the significant amount of informal discovery that the parties had

conducted. (*Id.* at 27.) The Court emphasized the unique circumstances of the case, in that Defendant acted as a pass-through to taxing authorities, but stressed that it "will require additional information, including detailed financial information, before giving final approval." (*Id.* at 28.)

The proposed notice satisfied Rule 23. The notice plan entailed AT&T's sending both a message with each customer's monthly bill and a text message to its current customers. (*Id.* at 30.) Former customers would receive notice via email, if they had provided the same to AT&T, or by U.S. Mail otherwise. (*Id.*) In addition, AT&T agreed to publish a notice twice in the *USA Today* newspaper. (*Id.*) The details contained in the various forms of notice met the requirements of Rule 23. (*Id.* at 30-33.)

## II.    The Settlement Agreement

The Court briefly summarizes the more important provisions of the Settlement Agreement, which acknowledges Plaintiffs' allegation that AT&T charged Internet Taxes to its customers in violation of the ITFA and/or various state statutes and common-law doctrines, thus rendering AT&T liable for damages, but makes clear that AT&T views these allegations as incorrect and denies all liability. (R. 50-3 at 13.)

The Agreement defines the relevant class as follows:

> All persons or entities who are or were customers of AT&T Mobility and who were charged Internet Taxes on bills issued from November 1, 2005 through [the final date on which AT&T Mobility issues bills to customers prior to implementing the billing system changes pursuant to Section 8.1].

> Excluded from the Settlement Class are: (i) AT&T Mobility, any entity in which AT&T Mobility has a controlling interest or which has a controlling interest in AT&T Mobility, and AT&T Mobility's legal representatives, predecessors, successors and assigns; (ii) governmental entities; (iii) AT&T Mobility's employees, officers, directors, agents and representatives; and (iv) the Court

5

presiding over any motion to approve this Settlement Agreement.

(R. 50-3 at 14-15.)  The Court certified this Class on August 11, 2010.[2]  (R. 97 at 34.)  The Court

further certified District of Columbia, Puerto Rico, and forty-five state-specific subclasses for:

> All persons or entities who are or were customers of AT&T Mobility and who
> were charged Internet Taxes in [STATE] on bills issued from November 1, 2005
> through the final date on which AT&T Mobility issues bills to customers prior to
> implementing the billing system changes pursuant to Section 8.1 of the Settlement
> Agreement.  Excluded from the [State] Settlement Class are: (i) AT&T Mobility,
> any entity in which AT&T Mobility has a controlling interest or which has a
> controlling interest in AT&T Mobility, and AT&T Mobility's legal
> representatives, predecessors, successors and assigns; (ii) governmental entities;
> (iii) AT&T Mobility's employees, officers, directors, agents and representatives;
> and (iv) the Court presiding over any motion to approve this Settlement
> Agreement.

(R. 97 at 34-35.)

The Agreement imposes a variety of obligations on AT&T.  First, the company must

cease charging the challenged Internet Taxes, though it may reinstate such charges if the Court

does not approve the Agreement or if "federal, state or local laws, statutes, regulations,

administrative decisions or pronouncements, or the interpretation of any of the foregoing

specifically requires, authorizes or permits the collection and payment of Internet Taxes on, or

on the charge for, any services or products set forth on Exhibit I."  (*Id.* at 15.)  Second, AT&T

must process and assist in processing refund claims on behalf of class members.  The Agreement

contemplates that the taxing jurisdictions have different methods for seeking reimbursement of

the taxes.  Specifically:

> 8.3.  In those Taxing Jurisdictions . . . in which only AT&T Mobility has standing
> to seek a refund of the Internet Taxes collected and paid by AT&T Mobility,

---

[2] The parties agree that the Court should exclude the Nevada and Idaho subclasses from
the Settlement.  (R. 156 at 53.)  The Court agrees, and thus amends the Class accordingly.

AT&T Mobility, on behalf of the Settlement Class but at AT&T Mobility's expense, shall file claims with the Taxing Jurisdictions for refunds of the Internet Taxes for the available period or periods for which refund claims may be filed under each jurisdiction's laws.

8.4. In those Taxing Jurisdictions . . . in which AT&T Mobility and Class Plaintiffs have standing to seek a refund of the Internet Taxes collected and paid by AT&T Mobility, AT&T Mobility, on behalf of the Settlement Class but at AT&T Mobility's expense, shall file claims joined in by the Settlement Class with the Taxing Jurisdictions for refunds of the Internet Taxes for the period or periods for which refund claims may be filed under each jurisdiction's laws.

8.5 In those Taxing Jurisdictions . . . in which only the Settlement Class Members have standing to seek a refund of the Internet Taxes collected and paid by AT&T Mobility, AT&T Mobility, on behalf of the Settlement Class but at AT&T Mobility's expense, shall prepare and provide: (i) a template for filing a claim for refund of Internet Taxes, (ii) documentation showing the aggregate Internet Taxes paid to each such jurisdiction for the period or periods for which refund claims may be filed under each jurisdiction's laws, and (iii) such other information reasonably necessary to prepare, file and process the refund claims as is requested by the Settlement Class and is available in AT&T Mobility's records, in a format determined by AT&T Mobility.

(R. 50-3 at 15-16.)

Third, the Agreement provides that AT&T and the Class Plaintiffs will seek interest from the Taxing Jurisdictions with respect to the refund claims when permitted by statute. (*Id.* at 16.)

Fourth, for those Taxing Jurisdictions that require AT&T to refund the relevant Internet Taxes to affected customers before those jurisdictions will grant a claimed refund, AT&T will make such a payment in escrow to a fund contemporaneously with the filing of the refund claim. (*Id.* at 17.) Pursuant to the Agreement, "each Settlement Class Member agrees that, for purposes of satisfying the requirement of any Taxing Jurisdiction, that [*sic*] AT&T Mobility refund taxes to the affected customers prior to granting or paying a refund claim, the payment by AT&T of an amount representing Internet Taxes paid by that Settlement Class Member into the Pre-Refund Escrow Fund will be considered the payment by AT&T of such taxes to such Settlement Class

Member." (*Id.*)  An entity unrelated to the Settling Parties will maintain the amounts paid into the escrow fund until one of two possible release events occurs, upon which time AT&T will receive back all amounts, plus any interest earned, it paid to the fund.  (*Id.* at 17-18.)

Fifth, the Class Members consent to AT&T's filing of claims and to the distribution of the Net Settlement Fund.  (*Id.* at 18.)  Sixth, the Agreement explains procedures for filing and prosecuting refund claims.  (*Id.* at 19-20.)  Should a taxing jurisdiction deny a refund claim, AT&T shall promptly notify Class Counsel and, if the latter decide to appeal, AT&T will cooperate in that process.  (*Id.* at 19.)  Independent counsel shall conduct any such appeals and will be paid from any funds realized by the appeal or, in the event that the appeal is unsuccessful, by Class Counsel.

The Agreement next provides that AT&T shall assign all of its rights in a refund to the Settlement Class and will seek to have the taxing authorities pay the refunded amounts directly to the Escrow Accounts.  (*Id.* at 20.)  To the extent AT&T directly receives refunds, it will transfer them to the Escrow Accounts within seven business days.  (*Id.*)  Importantly, "[t]he monies transferred by AT&T Mobility to the Escrow Accounts for refunds from a Taxing Jurisdiction shall be segregated . . . into separate accounts, each designated as originating from the specific jurisdiction for which the monies in questions were received . . ."  (*Id.*)

If a taxing jurisdiction issues future tax credits in lieu of a pecuniary refund, AT&T shall "remit monies in the amount of the credit . . . to the Escrow Accounts" within fourteen business days.  (*Id.* at 21.)  AT&T will apply no discount rate to compute the net present value of future tax credits spread over three years or less, but will apply a 5% discount rate for future tax credits that extend into fourth and succeeding years.  (*Id.*)

The Agreement further provides that AT&T shall remit the Vendor's Compensation collected from Class Members to the Escrow Accounts within seven business days, and the Escrow Agent shall segregate the monies into separate accounts, "each designated as originating from the specific jurisdiction authorizing the Vendor's Compensation and each for the benefit of those Settlement Class Members who were charged Internet Taxes from which the Vendor's Compensation at issue was deducted." (*Id.* at 22-23.)

Upon entry of a final order, the Agreement provides that Class Members who do not opt out and Class Plaintiffs "release and forever discharge AT&T Mobility from any and all claims . . . causes of action, obligations, . . . and costs, whether known or unknown . . . that were or could have been asserted or sought in the Actions, relating in any way or arising out of (a) AT&T Mobility's charging of the Internet Taxes . . . and (b) any and all claims that were asserted or could have been asserted by the Settlement Class in the Actions with respect to AT&T Mobility's charging of taxes, fees or surcharges on internet access allegedly in violation of ITFA, state and local laws." (*Id.* at 27.) The Agreement includes an express waiver to the fullest extent permitted by law and provides that "[t]he Settling Parties acknowledge, and the Settlement Class Members shall be deemed by operation of the Final Order to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part." (*Id.* at 28.)

Furthermore, AT&T has the right to set aside or rescind the Agreement if "any objections to the proposed settlement are sustained" or if "there are any material modifications to this Agreement, including exhibits, by the Court[.]" (*Id.* at 31.) Finally, the Agreement provides that the Court shall retain continuing jurisdiction over the Actions and the Settling Parties and that

9

"[a]ny dispute or controversies arising with respect to the interpretation, enforcement, or implementation of the Settlement Agreement shall be presented by motion to the Court, exclusively." (*Id.* at 34.)

## III.    Class-Member Objections

### A.    Douglas Cherry, individually and on behalf of Kraft Foods Global, Inc.

Douglas W. Cherry, individually and as attorney for Kraft Foods Global, Inc., objects to the Settlement on the ground that Kraft has reimbursed Cherry and thousands of its other employees for Internet-access taxes that AT&T charged to those employees. (R. 136.) Kraft Foods thus challenges AT&T's issuing refunds to its employees who are Class Members instead of to Kraft. (*Id.* at 1-2.) Cherry and Kraft Foods thus propose that, "in these situations, the employer (in this case Kraft) that actually paid the taxes be substituted as a member of the settlement class for all such individuals with respect to all such amounts." (*Id.* at 2.) They submit that "[t]he employer is the real party in interest with respect to all such amounts under the law of subrogation." (*Id.*)

### B.    Paige Nash

Objector Paige Nash contends that the notice provided to Class Members in this case falls short of the notice requirements of Federal Rule of Civil Procedure 23, violates those members' due-process rights, and contravenes the decisions of *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), and *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974). (R. 147.) Nash does not explain how the Settlement runs afoul of these decisions. Nash does contend, however, that due process requires that every single class member receive notice. (*Id.* at 1.) Furthermore, Nash submits that the lawyers for the class will file the fee petition after the

objection deadline and argues that this sequence also violates due process, Rule 23(h), and the Ninth Circuit's decision in *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 989 (9th Cir. 2010). (*Id.* at 1-2.). Finally, Nash states that "[a]ny discussion on attorney [*sic*] fees should not be made until after the amount collected is known. Right now there is no basis upon which to support an award of attorney [*sic*] fees." (*Id.* at 2.)

In a supplemental filing, Nash specifically incorporates Texas's objections to the settlement that "Texas consumers will recover nothing, though they will be bound by the release negotiated on their behalf"; "Texas law provides remedies for tax challenge"; "Texas is grandfathered under ITFA and the Lawyers knew it"; and "AT&T's customers fare better under Texas law than under the settlement." (R. 172 at 1-2.) She further objects that the alleged monetary relief to the Texas subclass is illusory and that the settling parties have not met their burden of proof. (*Id.* at 2.)

### C.      Mike Hale, et al.

Michael Hale, Summer Hogan, Michael Schulz, and Omar Rivero ("Hale") raise a variety of objections to the Agreement. (R. 141.) As a preliminary matter, Hale objects to the class definition because of its failsafe definition, which depends on the determination of an ultimate merits issue in this case. (*Id.* at 2.) Hale then articulates a series of further objections, specifically that: (1) the class notice improperly (though truthfully) states that objectors may be subject to depositions; (2) proponents of the Settlement have not carried their burden of proof that the settlement is reasonable, adequate, and fair; (3) there may be a disparity in the refunds that Class Members of different states receive; (4) the class notice does not provide sufficient information by which one could determine the actual dollar amount of fees sought by Class

Counsel; (5) the sought-after attorneys' fees are excessive under a lodestar analysis or a percentage-of-recovery analysis; (6) the class notice does not disclose the amount of expenses and costs that the attorneys seek reimbursement for and that amount may be excessive; (7) proponents of the Settlement cannot discharge their burden of proof on commonality, typicality, and predominance; and (8) the class definition is vague and ambiguous.  (*Id.* at 2-3.)

### D.        Travis Cox and Margaret Johnson

Travis Cox and Margaret Johnson, who are both members of the proposed Texas subclass, object to the settlement.  (R. 132.)  In addition to objecting generally to the class notice, which they deem insufficient, Cox and Johnson make a number of objections with respect to the Settlement itself.  They first note that the parties have reached a settlement without the benefit of formal discovery.  (*Id.* at 2.)  Observing Texas's difficult financial situation, they also express concern that the relevant taxing jurisdictions will not pay refunds.  (*Id.* at 2-3.)  Cox and Johnson also worry that Class Counsel will neglect AT&T customers in certain states in favor of customers in those states in which counsel will receive large fees on refunds.  (*Id.* at 3.)  Cox and Johnson further assert, without explanation, that the incentive payments to class representatives are excessive.  (*Id.*)

Cox and Johnson object with greater specificity to the fee petition.  (*Id.* at 3-6.)  They contend that "Class Counsel will not file an attorney fee application prior to the objection deadline on March 10, 2011."[3]  (*Id.* at 3.)  They therefore submit that "[c]lass members . . . were

_____

[3] As explained below, this objection is inconsistent with the Court's order of August 19, 2010, which provided that "Settlement Class Counsel shall file its application for class representatives' fees, attorneys' fees, costs, and expenses by January 26, 2011."  (R. 108.)  The Court's order also provided that "[o]bjections . . . must be filed by February 2, 2011."  (*Id.*)  Class Counsel filed their motion for attorneys' fees, costs and expenses, and for approval of

not given a reasonable time to evaluate and object to the motion," which they argue violates Federal Rule of Civil Procedure 23(h). (*Id.* at 3-4.) Cox and Johnson also rely on *Mercury*, 618 F.3d at 988, for the proposition that it is improper to set objection deadlines prior to the deadline for filing motions for attorneys' fees in class actions. (*Id.* at 4-6.) Finally, they object that [i]n this case there will not even be the opportunity to cross check using the lodestar method." (*Id.* at 6.)

###     E.        Angela Vrana and Barbara M. Fisher

Angela Vrana and Barbara M. Fisher object to the Settlement. (R. 143.) They argue that it would violate the parties' contract, which explicitly provides that the parties would resolve all disputes between them through arbitration. (*Id.* at 2-5.) Vrana and Fisher submit that, "[j]ust as that very agreement prevents one party to the transaction from resolving a dispute through a court or class action, the agreement also prevents ATTM from resolving a dispute through a court or class action." (*Id.* at 2.) They contend that the parties entered into the arbitration agreement because they expected that it would allow consumers to enjoy better recoveries than would be available in class actions. (*Id.* at 3.) They further submit that the Federal Arbitration Act compels AT&T to abide by its agreement to arbitrate, and argue that the law estops AT&T from contesting the enforceability of the arbitration agreement. (*Id.* at 4-6.) Vrana and Fisher thus request the Court to stay proceedings until the parties engage in arbitration. (*Id.* at 6.)

In the event that the Court declines to enter a stay, Vrana and Fisher articulate a variety of objections to the settlement. (*Id.* at 7-14.) They observe that, where—as here—settlement

incentive awards on January 26, 2011. (R. 125.) Cox and Johnson filed their objection on February 2, 2011. (R. 132.)

approval takes place before formal class certification, the law requires a higher standard of fairness. (*Id.* at 7.) They then proceed to make a number of criticisms. First, they contend that AT&T cannot obtain a refund from Texas because the state requires a person seeking a refund first to refund all relevant taxes and interest "to the person from whom the taxes were collected." (*Id.* at 8.) Vrana and Fisher submit that ¶ 8.7 of the settlement agreement will be inefficacious in this respect because a "pre-refund escrow fund" is not a refund and the parties' agreement that AT&T's payment into the escrow fund "will be considered payment by AT&T of such taxes to" the Class Member will not solve the problem. (*Id.* at 9.) They opine further:

> [C]lass members have no interest in or right to the money in the Pre-Refund Escrow Fund. More importantly, the state is not bound by the class members' agreement. The statute requires actual payment of the refund to the person who paid it, not an agreement by the payer that the ATTM has refunded the tax when, in fact, it has not refunded the tax.

(*Id.* at 9) (emphasis omitted).

Vrana and Fisher also express concern that AT&T's agreement to stop collecting taxes is illusory because it contains an exception that eliminates the promise. (*Id.* at 9-10.) Specifically, they point to language that gives AT&T the right to reinstate charges for Internet taxes if its "interpretation" of "federal, state or local laws, statutes, regulations, administrative decisions or pronouncements" requires or permits it. (*Id.* at 10.) Finally, Vrana and Fisher object that the $5,000 incentive awards are excessive because the class representatives "never had to respond to a single discovery request or deposition." (*Id.*)

## F.  Karen Wiand

Karen Wiand offers a rather detailed objection to the Settlement, and her counsel appeared at the fairness hearing to express these objections. (R. 116.) She broadly objects to the

nature of the Agreement, which purports immediately to relieve AT&T of all related breach-of-contract claims against it, while only imposing a future obligation on AT&T to help the Class Members obtain refunds from state and local governments.  (*Id.* at 1.)  Wiand also contends that her state, Michigan, has a tax statute of limitations, which precludes any recovery of "tax refunds back to 2005."  (*Id.*)  In addition, Wiand questions paragraph 8.2 of the Settlement Agreement, which she reads to permit AT&T to resume monthly billing upon expiration of the ITFA in 2014, even if state laws to the contrary then exist.  (*Id.* at 1-2.)  She further objects to the fact that the Agreement seeks to "saddle" the Class Members with the administration costs and attorneys' fees.  (*Id.* at 2.)  In addition, Wiand maintains that AT&T's improper tax collections underlying the present lawsuit are criminal violations of Michigan law, which render AT&T's cessation of the same to be invalid consideration for the Settlement.  (*Id.*)  Furthermore, Wiand considers the notice to be inadequate because "many consumers" did not receive the relevant text, the notice did not provide any information as to the amount consumers would receive under the Settlement, and because the notice "fails to apprise consumers that statutes of limitations would bar recovery for portions of the time period that are touted as encompassed by the settlement."  (*Id.* at 6.)  Wiand also objects to the $5,000 award that the Agreement purports to provide each named Plaintiff because none of those Plaintiffs responded to any written discovery, appeared for a deposition, or contributed in any other way to the litigation.  (*Id.*)

Finally, Wiand contends that Class Counsel have conducted the present litigation inadequately.  (*Id.* at 2-6.)  She specifically objects on the following grounds: (1) Class Counsel agreed to settle without conducting any formal discovery and thus seek to settle without "determining which states will pay refunds . . . [and] the specific actual procedure for refunds

which the various states would require"; (2) Class Counsel have failed to establish a procedure for proposed tax refunds for Michigan residents; (3) Class Counsel have improperly purported to represent Michigan class members via a Michigan law firm in which one of the partners testified as an expert at the request of AT&T in support of its motion to dismiss a similar consumer lawsuit; and (4) Class Counsel face a conflict of interest because, although they purport to represent consumers in all states, they "will receive payments of huge fees from refunds paid in some states even if consumers in other states receive little or nothing." (*Id.* at 3-6.) On this last point, Wiand further explains:

> Class counsel's disingenuous ploy to overcome this conflict is facile and immoral—arguing that this arrangement is perfectly fine because they will get little or no contingent fees from consumers in states where refunds are little or nothing—leaving totally unanswered the fact that those consumers would be sacrificed via permanent dismissal of their claims in favor of consumers in other states.

(*Id.* at 5.)

## G. Shelley Stevens

Shelley Stevens, a Class Member, objects to the Settlement on the following grounds: (1) every Class Member is entitled to personal service because AT&T knows their contact information; (2) the post card Stevens received did not provide information concerning Class Members' options or the deadline for objecting, opting out, or even filing a claim; (3) if AT&T wrongly collected taxes, then it should pay the Class Members; (4) the Settlement lacks cohesion because of divergent state (and circuit) laws, some of which may bar refunds due to statutes of limitations; and (5) Class Counsel and AT&T had not informed Stevens of the sought-after attorneys' fees. (R. 151.)

## H.        Margaret Strohlein

Objector Margaret Strohlein has filed a detailed objection.  (R. 156-4.)  Observing AT&T's "seemingly overt violations of the ITFA," Strohlein argues that the strength of Plaintiffs' case does not support settlement.  (*Id.* at 3-4.)  In this respect, she considers Defendant's potential defenses, as well as impediments to Plaintiffs' ability to recover independent of the Settlement, to be "hollow."  (*Id.*)  She further observes that the parties filed their joint motion for preliminary settlement only 70 days after consolidation, notes that the docket is devoid of conflict between the parties, and points out that there is no way to know whether the Agreement is beneficial to the Class because the parties did not conduct discovery. (*Id.*)

Strohlein also objects to the terms of the Settlement.  (*Id.* at 4-8.)  She contends that the requested fee is unreasonable and does not reflect what the attorneys would have received from a paying client in a similar case.  (*Id.* at 4-5.)  Strohlein observes that Lead Counsel estimate the maximum monetary recovery at $956,160,000, and request 25% of the same, which amounts to $239,040,500.[4]  (*Id.* at 5.)  Strohlein points out that, based on the number of days between consolidation and the fairness hearing, "92 attorneys will be entitled to a daily salary of $7,873.53, seven days a week, for 11 months of work."  (*Id.*)  She concludes that, "[t]o reward each attorney an average of $2.59 million dollars for such an uncertain reward after this protracted litigation is not even close to the going market rate."  (*Id.*)

Strohlein next argues that the reward to Class Members is uncertain "[d]ue to the wildly disparate laws among the states."  (*Id.* at 5-6.)  She then objects to the lack of a lodestar cross-

---

[4] According to the Court's calculation, however, 25% of $956,160,000 is $239,0400,000.

check, which the Seventh Circuit has noted is a guard against the over-compensation of attorneys that can accompany a percentage or common-fund approach. (*Id.* at 6 (quoting *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991).) She observes that Class Counsel's motion does not even disclose the lodestar amount, "making this Objector curious as to how many hours were actually spent in settling this case." (*Id.* at 7.) She points out that it would not be difficult to conduct a lodestar cross-check because attorneys routinely keep track of their hours and, because the case has not been protracted, the Court would not have to review voluminous billing records. (*Id.* at 7.)

Class Counsel's argument that a lodestar approach is inappropriate because the lodestar amount would increase post-settlement does not convince Strohlein. (*Id.* at 7-8, 11-13.) She points out that "[t]heir economic expert, Dr. Landes, was capable of estimating future tax rates in 2,000 taxing jurisdictions" and suggests that "she could also estimate the attorney hours required going forward." (*Id.* at 8.) Strohlein also observes that, according to the terms of the Agreement itself, Class Counsel will have a limited role in managing the claims. (*Id.*) She explains:

> [T]he Settlement Administrator and Escrow Agent (entities and individuals independent of Class Counsel) will be managing the collection and distribution of funds. The Administrator and Escrow Agent will be paid for by the Class (5% of every refund shall be contributed from each Class Member to the administration of this fund). . . Additionally, it is AT&T that will conduct the bulk of the work in recouping the recoveries. Of the three 'types' of taxing Jurisdictions, AT&T is permitted to collect on behalf of the Class Members in two of those jurisdictions. In the third type, the Class Member must claim its own refund[,] so, AT&T will fill out all necessary paperwork and provide it to each Class Member in those jurisdictions. It is therefore unclear what extensive attorneys' fees Class Counsel will continue to accrue during the disbursement of the Class Members' rewards.

(*Id.* at 8) (internal citations omitted.)

Strohlein reminds the Court that Class Counsel's experts, though highly qualified, are

nevertheless effective employees of Class Counsel, and so the Court should discount their opinions accordingly.  (*Id.* at 9.)  Strohlein disputes the substance of Dr. Landes's expert report, which calculates the present value of benefits that the class would realize by virtue of the Settlement at $2.02 billion.[5]  (*Id.* at 9-11.)  She argues that Dr. Landes could have used a more accurate method for calculating a common "tax rate" that AT&T might otherwise collect in the future but for the Settlement.  (*Id.* at 10.)  Strohlein characterizes Dr. Landes's averaging all the states' and jurisdictions' tax rates as speculative.  (*Id.*)  She also criticizes Dr. Landes's method for calculating the relevant discount rate, which involved using the yield on an index of U.S. bonds with short-term maturities issued by utilities and phone companies as a proxy for AT&T's debt rate.  (*Id.* at 10-11.)  Strohlein criticizes Dr. Landes for failing to explain how those other companies' debt rates are comparable to those of AT&T.  (*Id.*)

Finally, Strohlein argues that the certified class does not meet the predominance requirements of Rule 23(b) because "each state provides different remedies for consumer protection statutes and different tax rates for each city and state."  (*Id.* at 13-14.)

## I.       Robert Shattuck

Robert Shattuck expresses concern with class actions that implicate the rights of many people, where those affected rights are significant in the aggregate, but minimal at the level of the individual owner.  (R. 156-6.)   He worries that class-action settlements, including the one presently before the Court, foster collusion between corporate management and plaintiffs'

---

[5] At the March 10, 2011, hearing, Dr. Landes revised the $2.02 billion figure downward slightly in light of updated figures that became available.  The revised saving to Class Members from AT&T's agreeing no longer to collect the relevant taxes, as calculated by Dr. Landes, is approximately $1.98 billion.

lawyers.  (*Id.* at 4-5.)

With respect to the Settlement Agreement specifically, Shattuck objects that it will prevent AT&T's shareholders from determining whether the company's management was corrupt or negligent and further argues that customers have alternative avenues by which to seek compensation, and that it overrides rules and limitations put in place by lawmaking bodies and violates the business-judgment rule.  (*Id.* at 7-8.)  Shattuck further submits that the Court should not award attorneys' fees in excess of $100,000.  (*Id.* at 9.)

## IV.     Amicus Briefs

A number of states have filed amicus briefs, asking the Court to reject the Settlement Agreement.

### A.         Texas

Texas states that it "is not willing to submit to an agreement between private parties that a made-up procedure, in conflict with Texas law, will be used" and submits that "[a]n order from this Court approving the private agreement has no bearing on this fact."  (R. 178 at 8.)  It contends that the Settlement Agreement "will control and interfere with Texas tax collection procedures" and thus "asks that the Court remove the Texas Subclass from the case for two reasons."  (*Id.* at 8-9.)  These reasons are, first, that the only federal interest in this case concerns the ITFA, which, Texas maintains, grandfathers the state such that "the ITFA does not apply to collection of sales taxes from AT&T's Texas customers."  (*Id.* at 9.)  Second, Texas argues that, "[u]nder the Settlement Agreement[,] each member of the Texas Subclass is likely to receive a zero recovery while forfeiting possibly valid claims under a broad release of AT&T."  (*Id.* at 9, 21-24.)

Texas further contends that its laws require AT&T to collect taxes on Internet-access service, such that the Agreement's provision requiring AT&T to stop collecting or remitting these taxes would violate Texas law.  (*Id.* at 10.)  It also submits that, absent the Agreement, AT&T could assign its refund rights to its Texas customers, thus enabling them to receive 100% of any refund.  (*Id.* at 11.)  Furthermore, the state maintains that Plaintiffs seek relief beyond the power of this Court to grant, "namely an injunction against AT&T [*sic*] collecting state sales taxes on Internet access charges in Texas[.]"  (*Id.* at 12.)  Texas thus argues that the parties' private agreement does not "confer power on this Court to excuse AT&T from its duties under Texas law."  (*Id.* at 13.)

The state appeals to the Tax Injunction Act ("TIA"), which it contends forbids "federal district courts to 'enjoin, suspend or restrain the assessment, levy or collection of any tax under State law,' provided that an adequate remedy is available in the state courts."  (*Id.* at 14 (quoting 28 U.S.C. § 1341).)  Texas quotes the Seventh Circuit to the effect that, "if the relief sought would diminish or encumber state tax revenue, then the [TIA] bars federal jurisdiction over claims seeking such relief."  (*Id.* at 15 (citing *Levy v. Pappas*, 510 F.3d 755, 762 (7th Cir. 2007), *abrogated by Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323, 2329 (2010).)  The state concludes that the TIA "strips this Court of jurisdiction to prevent or interfere with AT&T's collection of Texas sales taxes."  (*Id.* at 16-19.)  It forewarns that, "when a Texas court inevitably orders AT&T to resume the collection of state taxes, as is required under state law, AT&T may refuse to do so, citing its federal consent decree."  (*Id.* at 18.)  Texas also argues that comity "restrains federal courts from entertaining claims for relief that risk disrupting state tax administration."  (*Id.* at 15-16.)

In addition, Texas contends that the parties "hope to use orders from this Court to force states to acknowledge compliance with state law when there is no compliance." (*Id.* at 24.) Quoting Paragraph 8.7 of the Agreement that payment by AT&T into the Pre-Refund Escrow Fund "will be considered the payment by AT&T of such taxes to such Settlement Class Member," the state reads this language as "an attempt by the parties to force the Texas Comptroller to adhere to their agreement concerning Texas tax law." (*Id.* at 28)

**B.      Ohio**

Ohio has filed an amicus brief, submitting that the Court lacks subject-matter jurisdiction due to the TIA and principles of comity. (R. 171.) The state submits that "the TIA bars a federal district court from granting the 'injunctive' relief sought by the Plaintiffs" because "where, as here, there are 'plain, speedy, and efficient remedies' available to the Plaintiff class in state courts, the TIA expressly bars federal district courts from issuing order to 'enjoin the assessment, levy, or collection of any tax under State law.'" (*Id.* at 2.) Ohio further explains that, "[b]y seeking to enjoin AT&T from collecting certain Ohio sales taxes, the Plaintiffs' Complaint thereby impermissibly seeks this Court to enjoin Ohio from collecting the tax." (*Id.*) It concludes by asserting that "any agreement by AT&T with its customers to cease collection of validly imposed Ohio sales taxes may not properly bind Ohio." (*Id.*)

**C.      Colorado, Arkansas, Florida, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Mississippi, Utah, and Wyoming**

Colorado, Arkansas, Florida, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Mississippi, Utah, and Wyoming have collectively filed an amicus brief, similarly arguing that the TIA and principles of comity bar federal district-court review. (R. 179.) They also submit that Class Members will receive less-favorable treatment than if they were simply to file for

refunds themselves, and contend that the Settlement Agreement's provisions conflict with state law, thus creating uncertainty as to the operation of the same.  (*Id.*)

Focusing on the language of the TIA, which provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State[,]" amici first observe that the statute prohibits the Court "from enjoining the collection of any tax, not just taxes collected by a state."  (*Id.* at 5) (emphasis omitted.)  They then point out that "each state named in the Complaint provides for a plain, speedy and efficient remedy[.]"  (*Id.*)  Submitting that the Court thus lacks subject-matter jurisdiction, amici urge the Court to dismiss the present action in its entirety.  (*Id.* at 7.)

Amici also argue that the Court should dismiss this action pursuant to principles of comity.  (*Id.* at 7-10.)  They submit that Congress did not create a private right of action to enforce the ITFA, and thus conclude that "the plaintiffs have no right of action to pursue a federal lawsuit to enjoin the collection of these taxes."  (*Id.* at 8-9.)

The states next contend that the Settlement Agreement is unfair to taxpayers because they would reap a greater benefit if they availed themselves of the states' existing mechanisms for recovering improperly collected taxes.  (*Id.* at 10-12.)  They further contend that AT&T will not be liable for any damages, costs, or expenses, but submit that, instead, "AT&T Mobility's customers—the members of the Plaintiff class in this action—bear all of the costs, including attorney fees."  (*Id.* at 11.)

Amici further submit that Class Counsel's request for attorneys' fees is exorbitant because they vastly exceed the value that Counsel have realized for the Class.  (*Id.* at 13.)  The

states contend that no class action was necessary because taxpayers could have availed of the various states' refund mechanisms. (*Id.*) They also characterize the monetary award as speculative. (*Id.* at 14.) Pointing to Colorado law, which provides that a person's right to a refund shall not be assignable, the states argue that "the claimed refunds at issue in this litigation cannot be assigned by the taxpayer to AT&T Mobility." (*Id.* at 15-16.) They conclude by observing that, "[p]ursuant to the TIA, any [order that requires Colorado to issue refund vouchers to AT&T] . . . cannot emanate from a federal court; it must issue from a Colorado court, which can properly exercise jurisdiction over the Department." (*Id.* at 16.)

## V. The Fairness Hearing

On March 10, 2011, the Court held a fairness hearing at which the parties had several witnesses testify and the Court entertained any objections to the Settlement. (R. 169.) During the hearing, the Court assessed the credibility of each of the witnesses.

### A. Dr. Elisabeth Landes

Dr. Elisabeth Landes, a Senior Vice President at Compass Lexecon who holds a Ph.D. in economics from Columbia University, testified for the settling parties. Dr. Landes provided a convincing expert opinion as to the value of the continuing tax savings that Class Members will receive due to AT&T's no longer collecting the challenged taxes.

In conducting her analysis, Dr. Landes testified that she did not assess the varied details of state-specific tax collections because it would have been both difficult and misleading, creating a false sense of precision. Instead, she looked at data on state-by-state unauthorized tax collections, which she used to determine the average tax rate. She also relied on the predictions of independent industry investment analysts as to AT&T's anticipated future revenues from

wireless data services, explaining that economists regularly rely on such information.

Dr. Landes testified that AT&T's fourth-quarter financial results, which "came in somewhat under the analyst projections[,]" caused analysts to revise their ongoing projections, which she in turn relied upon. In performing her calculations, Dr. Landes estimated the value of the continuing tax savings to the Class until November 1, 2014, when the ITFA expires. In calculating the value to the Class, Dr. Landes determined that the relevant discount rate was equal to AT&T's debt rate. Because she could not find publicly available data as to AT&T's debt rate, however, she relied upon data published by Merrill Lynch with respect to a portfolio of corporate bonds issued by utilities and telephone companies with short-term maturities.

In her original report, Dr. Landes estimated the value to the Class of AT&T's agreement to cease collecting the challenged taxes at approximately $2.02 billion. In light of the updated information that became available to her, including AT&T's fourth-quarter earnings report, however, Dr. Landes revised the relevant value to $1,986,263,000.

### B.      Dr. Barry Thomas Florence

Dr. Barry Thomas Florence, president of ARPC—a research and consulting firm in Washington, D.C. that the Court appointed as interim settlement administrator (R. 122) —testified at the hearing. Dr. Florence, who has a Ph.D. in research design of statistics from Michigan State University, testified that, in addition to his work as notice administrator for the Settlement, he evaluated the methodology that AT&T had used to determine the customers whom the Internet-access tax affected. He assisted in the interviews and selection of potential escrow banks for the Settlement, and monitored the status of the electronic-reading room that had been established pursuant to the Agreement.

Dr. Florence had numerous meetings with AT&T to evaluate the company's retrieval of information necessary to implement the Settlement. In those meetings, he sought to understand the data structures of the databases that maintain records on AT&T's subscribers, what services those subscribers use, how AT&T charges them, how it maintains the billing, and how the company charged and collected taxes from those users. In identifying the Internet-access services that AT&T used, its tax department identified over 20,000 combinations of so-called feature and service-order codes ("SOCs"). PricewaterhouseCoopers ("PwC") tested this process to validate the code listings, and determined that an additional 4,000 feature SOC codes might include Internet-access services. After eliminating duplicative codes, as well as those that applied to non-taxing jurisdictions, Dr. Florence, in conjunction with AT&T and PwC, finally identified approximately 13,900 feature SOC combinations. AT&T then applied the final list of codes to its customer-bill database, and identified the amount of tax that was subject to a refund for each individual customer. It identified 46-million relevant billing records and about 29-million actual account holders. Dr. Florence explained that this process was the same that AT&T used to obtain the data that serves as the basis for the refund claims in the taxing jurisdictions. He credibly concluded that the preceding approach taken by AT&T was reasonable.

Dr. Florence then testified about his function as notice administrator. He explained that the class notice included multiple types of notice, including inserts into current customers' bills, text messaging, publication, and email. AT&T performed the bill-insert, text-message, and publication forms of notice, which focused on current customers, while ARPC, with AT&T's assistance, accomplished email and direct-mail notice, focusing on Defendant's former

customers. ARPC assisted in the creation of a website and 1-800 number service, which conveyed detailed information regarding the Settlement Agreement, the Court's orders, and the long-form notice.

Dr. Florence explained that AT&T provided him with records pertaining to over 11 million of its former customers. Employing a successful-delivery-verification procedure, ARPC sent email notice to the roughly 3.5 million of those customers for whom AT&T had email addresses. It successfully delivered approximately 1.1 million emails. For the roughly 10 million former customers to whom ARPC could not send emails, it sent 9.1 million post cards. AT&T paid the costs involved.[6]

Next, Dr. Florence testified as to ARPC's monitoring of the refund status. He pointed out that the total tax for Internet-access service remitted over of a five-year period from 2005 to 2010 was about $1.15 billion. Dr. Florence looked at the last three years of the remittance because many taxing jurisdictions have three-year statutes of limitations for refunds. He explained that the total amount remitted within the three years prior to November 2010 was 83% of the five-year amount, or slightly over $950 million. In addition, he testified that the system that the parties and ARPC have put in place will facilitate a prompt process for sending checks to Class Members when refund money flows in from any given state. Dr. Florence also observed that, in his experience, the fact that Class Members need not make a claim of any type is unusual. Furthermore, he testified that the parties have applied for a total of about $1.1 billion in refunds

---

[6] Dr. Florence also explained why Bank of New York Mellon, which this Court appointed as Escrow Agent (R. 122), was the most qualified for this role. He observed that the bank had done comparable settlements in the past, that ARPC had worked with the bank before and had been impressed, that the bank had a dedicated and talented team, and that the cost factor was attractive.

from the various taxing jurisdictions.

**C.	Donald Sipple**

Donald Sipple, a marketing consultant and a Class Representative, also testified at the March 10, 2011, hearing.  He explained that his reason for acting as a representative was driven by the principle that he should not pay taxes that the law does not obligate him to pay.  He also stated that he had agreed to do everything necessary to be a Class Representative, including flying to Chicago to testify at the hearing.  Sipple had no problem "at all" with the requested attorneys' fee.

**D.	Alice London**

Alice London, an attorney with the Texas law firm of Bishop London & Dodds, which is co-counsel in the present case, testified as to the legal research that her firm conducted, and continues to conduct, on Texas law.  After determining that AT&T was in fact charging a tax on Internet access, the firm filed a lawsuit on January 11, 2010.  Shortly thereafter, she and her colleagues at Bishop London learned of the motion to consolidate and subsequently kept themselves informed of settlement negotiations in the present MDL.  She opined that the Settlement Agreement works well under Texas law, reasoning as follows:

> [I]t provides an inherent advantage in that the consumers get to share the
> expenses, AT&T waives the defenses which in Texas just litigating the defenses
> would cost more than the benefit.  So, this settlement agreement is efficient in
> terms of time, the advantage of getting it done now versus arbitrating or litigating
> for years is an inherent advantage.  And the fact that AT&T has assumed the
> responsibility not only in terms of the burden of proof, but collecting the data and
> the time of going through the Texas process, which is a very administrative
> intense process provides an enormous advantage to Texas consumers. . . . [Our
> client] was highly in favor because it involved no effort on the part of consumers.
> They didn't have to go back and dig up four years' worth of bills . . . . [It] did not
> require any time and effort on the part.  He particularly liked the fact that AT&T
> was going to collect the data and submit the claim to the . . . comptroller[.]

Ms. London further testified that she had read Texas's letter to the Court, which, she believed, did not raise any new issues that her firm had not researched in anticipation of the lawsuit and Settlement. Ms. London testified that the fact that the Texas "refund request might have to be litigated" did not change her opinion about "whether it was worth pursuing." None of the issues raised in that letter changed her opinion that the Settlement Agreement is fair, reasonable, and adequate.

Ms. London's firm did not contact the Texas Comptroller's office to inquire how it would deal with a refund request because, had it done so, there would be no telling whom one would end up speaking with on the phone and because informal discussion does not bind the comptroller. She credibly concluded that "[m]y experience with the comptroller's office is [that] you don't know what the outcome is until you go through the process."

### E.        Joel Grant Woods

Mr. Joel Grant Woods, an attorney and former Attorney General for Arizona for eight years, also testified at the fairness hearing. The Court found Mr. Woods's testimony to be particularly valuable.

Mr. Woods took part in the negotiation sessions with AT&T in the present case and offered his view that the Agreement constitutes "an outstanding settlement." He opined that the fact that AT&T had stopped collecting the relevant taxes was an important factor, and further explained that he had made contact with Arizona's revenue department and was certain that the state had everything it needed from AT&T. With respect to Arizona, he testified that he did not "believe [that] the state has much of a choice here at all and if the state chose to litigate this . . . there's a variety of administrative hoops you have to jump through . . . including ultimately the

director of the department of revenue.  And when that is completed, you would then go to the superior court and then you could go to the Court of Appeals.  And if you had to, you could try to petition the Arizona Supreme Court. . . .  So, the bottom line on this as far as I can see is nothing's changed since I was Attorney General.  The department of revenue and state of Arizona is [sic] expected to follow the law.  The law is very clear in the state of Arizona.  And I expect that they will follow the law."  Mr. Woods further testified that the Settlement Agreement commits him to pursue litigation if Arizona initially refuses to issue a refund, and that he would be willing to do so on a contingent-fee basis "because the law is clear and I expect the state of Arizona, much as I would expect the state of Texas and the state of Michigan for that matter, to follow the law."

When asked about potential problems in obtaining refunds pursuant to the Settlement in Michigan, Mr. Woods testified that he had met with the state's department of revenue in Lansing, Michigan, and did not anticipate a problem.  Finally, he testified that the fees that he will incur in going through the refund process, and potentially appealing, are subsumed within the attorneys' fees limit of 25% of the cash recovered for the Class.  Separately, in response to the same question, Mr. Edward Robertson testified that, "as the lead counsel, you won't see us back with our hand out."

## F.       Edward Robertson

Edward Robertson, lead counsel for the Class, was next to testify.  He described the circumstances and research that led to his filing a variety of lawsuits against AT&T, and recounted the details of the ensuing negotiations with the company.  With respect to objections to the Agreement that settlement is taking place without formal discovery, Mr. Robertson

explained that plaintiffs' counsel had spent close to a million dollars on the case and opined that the informal discovery that had taken place was akin to formal discovery. In fact, he thought it was more helpful given the manner in which AT&T provided it. He contrasted AT&T's "nicely arranged" and forthcoming provision of information with the having to "find a particular piece of hay in a haystack" that typically characterizes formal discovery.

With respect to putting the Agreement into operation, Mr. Robertson testified that "all of the refund applications that were required to be filed have now been filed." He explained that, as of March 2011, they had obtained a little less than a million dollars, including the credit offered by the city of Tuscon, but also said that he thought a lot more is coming. He noted that AT&T has been "cooperating really unbelievably well with us[.]" He noted, however, that some authorities have told them that they are not going to deal with them until the Court finally approves the Agreement. Mr. Robertson also opined that a little more than 50% of the total work involved in implementing the Settlement remains to be done. He explained that some cities have said that they "are not going to pay unless there's a judgment against them in these times. And that's what we're prepared to do."

Mr. Robertson testified that 92 lawyers are involved in implementing the refund process under the Settlement. He explained that there are 44 different contingency agreements to the effect that "all of these local-counsel law firms . . . will get a percentage of the fee for that state in which they have undertaken the representation."

An important subject of testimony involved the question whether the lawyers charged with implementing the Agreement could decide in the face of recalcitrant taxing jurisdictions that the cost of pursuing refunds outweighs the benefits. Mr. Robertson explained that the

attorneys "responsible for a local state get[] paid out of that state's fund. There is no national pot of money. It's all 44 different state pots. The way we've arranged it with all these lawyers is, is that your state is what you have to concentrate on and that's how you will be paid if you get paid."

As to his view why the Court should approve the Settlement, Mr. Robertson opined:

[T]his is a case that was going to be a long, hard-fought case. We thought we had a chance to do some good in it. But the truth of the matter is they had some defenses. And this could have gone on for a very long time. And if we'd have just pursued a breach-of-contract action or something like that, I think we'd be in front of Judge St. Eve eight years from now having fought through the class fight and all the defenses if we hadn't been thrown into arbitration because the United States Supreme Court had ruled in favor of AT&T in the *Conception* case. So, this would have been a very difficult case, a very expensive case and I don't think frankly that we would have done much better at the end of the day than we did with this settlement in terms of getting relief quickly to the customers, stopping the tax, and creating a system which gave them an opportunity to get back a substantial amount of the money that they had paid out without doing anything except opening their mailbox one day.

Finally, Mr. Robertson summarized the costs that AT&T has borne to date, noting that the company had paid back, or will pay back after final approval, all of the vendor's compensation it got to keep from the states for collecting and passing on the relevant taxes. This amounts to $2.2 million. He also explained that AT&T paid the full cost of notice, which is substantial, and has an ongoing responsibility to provide the relevant information to facilitate the acquisition of refunds.

### G.      Dean Robert Klonoff

Finally, Robert Klonoff, the Dean of Lewis & Clark Law School and an expert on class actions, testified at the fairness hearing. He provided a detailed explanation as to why, in his view, the Settlement Agreement is fair and reasonable.

Dean Klonoff identified the strength of the case compared to the amount of the offer as being of "critical importance," and observed that Plaintiffs' case had "enormous complications[,]" pointing out the arbitration agreements and voluntary-payment doctrine as "a huge problem" and identifying the questions of standing and private rights of action as "enormously difficult." Plaintiffs' conservative probability of success, he thought, was less than 50%. Viewed in light of these difficulties, and the significant length of time it would take to litigate the case to judgment, he testified that "this is an exceptional settlement. The class is getting – has already gotten going forward relief worth about $2 billion and they have the prospect now for recovering a substantial portion of their out-of-pocket losses." As to AT&T's ability to compel arbitration, Dean Klonoff opined that, if the company had chosen to exercise that ability, "the reality is most of these people wouldn't have pursued it and most of these people would never have gotten relief. And that's why I think this is such an important settlement and why I think it's such a good settlement."

Dean Klonoff particularly praised the fact that the Settlement allows the Class to obtain recovery very quickly, and contended that AT&T had gone beyond what he would have advised it to do had he been its counsel. Beyond the going-forward relief, Dean Klonoff pointed to AT&T's actions with respect to vendor's compensation, the cost of notice, and putting money into escrow if a taxing jurisdiction requires such action as a prerequisite to granting a refund. Separately, he rejected the contention that the Settlement is unfair because AT&T is "not paying billions of dollars" on the ground that this case involved a pass through, in which "AT&T collected the money. And other than these small fees, they got nothing out of this."

As further evidence of the Settlement's fairness, Dean Klonoff observed the fact that

there has been "[v]ery, very little opposition" amongst Class Members. He pointed out that "[t]here were 10 objections filed . . ., representing a total of 16 people. About 235 opt-outs. . . . [U]sually in a case like this, you'll see with potentially 35 million class members, you'll see thousands of opt-outs." He also cited the fact of early settlement, made after due diligence, as an attractive feature of the Agreement. He noted that "the informal discovery that was done was really everything that would have been done in discovery." When asked to compare the Settlement Agreement to others he had seen, he opined that "[t]his is one of the best settlements I've ever seen. . . . I would say this is the stronger consumer settlement I've ever seen in terms of value to the class."

Dean Klonoff then proceeded to address the reasonableness of the sought attorneys' fee, which is 25% of the cash that Counsel recover for the Class. He testified that the ten-percent alternative "isn't going to arise here because that would only arise if the refunds exceeded the amount of the going-forward relief." He then explained why he considered a percentage-of-the-fund approach to be superior to a lodestar approach in common-fund cases, observing that the latter approach "provides incentives for lawyers to keep on putting in time long after they need to or should be. It doesn't really correlate with the value of what's been [achieved] for the class. . . . [T]he percentage of fund is a better method because it best aligns the incentives of the lawyers and the class." He also agreed that "the maximum [attorneys'] fees that could ever be paid if every penny of potential tax revenue is actually collected is 8.1 percent of the value of the settlement[.]" Dean Klonoff pointed out, however, that it will likely "be something below eight percent." He further explained that he prefers "to talk about the 8 percent and not the 25 percent because the 25 percent is only 25 percent of the cash, but the cash is just one part of the overall

settlement."

Defining "mega-fund" cases as those involving "in the order of a hundred million and above," he observed that, as an empirical matter, "8 percent is low, even for mega-fund cases." He also agreed that, if one were to evaluate the Settlement as 44 separate subclasses, "a fee request of 8.1 percent of the total value would be very much on the low end[.]" He contrasted this fee request with many contingent-fee agreements that are "in the neighborhood of 33 percent." Finally, he pointed out that, even if one were to look only at auction cases, "8 percent . . . is comfortably on the low end[.]" He observed that most auction cases are securities-fraud cases that involve significant government work on the front end and less risk.

Dean Klonoff next addressed the reasonableness of the sought incentive payments for the Class Representatives. He thought that these sums are "a very small amount of money" in the scheme of things. He cited empirical work finding the average incentive payment to be approximately $16,000 and the median payment to be about $4,000. Dean Klonoff concluded that "we're right in the ballpark." As to the Representatives themselves, Dean Klonoff observed that they "had no idea what they'd be required to do, but they agreed to step up and participate in discovery, to be here today, . . . and to do whatever it took to make sure that the settlement achieved the result for the client."

Finally, Dean Klonoff testified that he had reviewed the objections filed against the Settlement Agreement "very carefully," and had rejected them. In particular, he considered that the objections were devoid of details that would make the Settlement better. He concluded that, if "the Court were to agree with the objections and invalidate the settlement, the end result would be the Class would suffer because, of the 36 million people, I would say you probably have

hundreds at most that [*sic*] would pursue the arbitration or other remedies.  The rest would be left without anything."

**LEGAL STANDARD**

A court may approve a settlement that would bind class members only if it determines after a hearing that the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(3).  To evaluate the fairness of a settlement, a court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement."  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

"The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'"  *Synfuel*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)).  Furthermore, "[i]n conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.'  To do so, the court should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.'"  *Id.* (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002)).

"Federal courts naturally favor the settlement of class action litigation."  *Isby*, 75 F.3d at 1196.  Nevertheless, the Seventh Circuit has warned that "the structure of class actions under

Rule 23 . . . gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010) (emphasis omitted). District courts must therefore "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel*, 463 F.3d at 652.

## DISCUSSION

### I. The Settlement Satisfies Rule 23 Because It Is Fair, Reasonable, and Adequate

Applying the five factors identified in *Synfuel*, 463 F.3d at 653, the Settlement is "fair, reasonable, and adequate" and thus meets the requirements of Rule 23. Indeed, each of these factors support this Court's approval of the Settlement.

### A. The Class Members' Recovery Under the Settlement Strongly Supports the Settlement's Fairness in Light of the Weighty Arguments that AT&T Could Raise Should the Class Action Proceed Toward Trial

As noted above, the "most important factor" in determining whether a proposed settlement satisfies Rule 23 is the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653. Because the Settlement promises to yield benefits to the class that are significant in light of AT&T's potentially strong defenses should the case proceed to trial, the first factor under *Synfuel* counsels approval.

#### 1. The Class Members Will Realize Significant Benefits from the Settlement

Following the Court's opinion granting preliminary approval, the parties have produced more-specific evidence of the benefits that the Class Members will realize as a result of the

Settlement. This evidence reveals that the Class Members will realize significant value as a result of the Agreement.

Based on the evidence presented at the fairness hearing, as well as on the relevant briefing, the Court finds that the aggregate expected benefits to the Class Members from the Settlement, in terms of obtaining refunds, significantly exceeds both (1) the expected return of proceeding to trial in the case and (2) the amounts that the Class Members would obtain if they proceeded individually against AT&T through arbitration. As explored below, AT&T has a number of significant defenses that would make it difficult for Plaintiffs to proceed to trial and, once there, to win. Furthermore, the Court credits Dean Klonoff's convincing testimony that, were AT&T to compel arbitration, "the reality is most of these people wouldn't have pursued it and most of these people would never have gotten relief." In addition, a highly desirable feature of the Settlement is that Class Counsel "will only be paid from state-specific escrow accounts if those accounts are funded through refunds or credits from the taxing jurisdictions[.]" (R. 97 at 26.) Counsel for each state-specific subclass have an incentive to pursue claims from their assigned state, which they will not abandon due to cross-subsidization from other, more lucrative states.

The financial benefits that the Class Members will realize from the Settlement are far from academic. By March 8, 2011, the parties had requested refunds or credits from 1,193 taxing authorities in 44 states and territories, totaling $1.152 billion.[7] (R. 164 at 11-12.) As of April 12, 2011, the parties have requested local-level refunds of $147,598,738 and state-level

---

[7] For those jurisdictions that only allow class members to seek refunds, AT&T has provided refund claim templates. (R. 156 at 33.)

amounts of $1,006,532,347, for a combined total of $1.154 billion. (R. 185-1; R. 185-2.) As of the same date, the parties have received payment of $1,660,958 at the local level and $4,739 at the state level. (*Id.*) As AT&T collected and passed on approximately 17% of the relevant taxes prior to November 2007, and as the majority of taxing jurisdictions have a three-year statute of limitations, Class Counsel estimate the maximum expected cash portion of the recovery for the Class to be $956,160,000 (83% of $1.152 billion). (*Id.*; R. 156 at 34.) The Court thus finds that the expected cash value of the Settlement to the Class strongly counsels approval.

The second major benefit to the Class Members concerns AT&T's obligation under the Agreement "to cease charging the challenged Internet Taxes[.]" (R. 50-3.) As explored above, Dr. Elisabeth Landes filed an expert report and testified at the March 10, 2011, fairness hearing. At that hearing, Dr. Landes conservatively estimated the value of AT&T's no longer collecting the challenged taxes at approximately $1.98 billion.[8] This figure, she asserted, significantly underestimates the value of the Settlement to AT&T's subscribers as a whole, not all of whom are Class Members. Dr. Landes calculated the value to AT&T's subscribers at over $4.1 billion.[9] (R. 163-2 at 5.)

Having reviewed Dr. Landes's report, having studied her methodology, and having

---

[8] In her report, which preceded the fairness hearing, Dr. Landes concluded that the value of continuing tax savings to Class Members from AT&T's agreement to cease collecting the challenged taxes within 30 days of the Court's preliminary approval of the Settlement was approximately $2.02 billion, discounted to present value. (R. 163-2.) She subsequently revised this figure downward, however, to $1.98 billion in light of financial data that became available to her after preparation of her report.

[9] Although Dr. Landes did not revise this figure in light of updated financial information that became available to her after she prepared her report, she testified at the March 10, 2011, hearing that it would possibly be in "the order of $4 billion" were she to do so. (Tr. at 36.)

observed her testimony at the fairness hearing, the Court finds her conclusions to be convincing, with one qualification. Although it accepts her calculation that the Class Members will experience $1.98 billion in value from AT&T's cessation of the challenged activity, that figure overestimates the value that is specific to the Agreement because Dr. Landes's analysis implicitly assumes that, but for the Agreement, AT&T would have continued charging the relevant taxes. The Settlement's value to consumers in requiring Defendant to cease collecting the Internet taxes, however, depends on the probability that AT&T would have voluntarily ceased those collections independent of the Agreement. If AT&T would have stopped charging those taxes regardless of whether it entered into the Agreement, for example, then the marginal value to the Class of the Agreement with respect to stopping the impugned conduct would be zero. Conversely, if—as the parties and Dr. Landes assume—Defendant would have kept charging the relevant taxes but for the Settlement, then the benefits that the Class Members would realize from the Agreement's provision requiring AT&T to cease collecting Internet Taxes would indeed be $1.98 billion.

There is compelling evidence, however, that Defendant would have ceased charging the relevant taxes regardless of whether it had entered into the Settlement. In the first place, there is a genuine question whether AT&T's collection of Internet Taxes violated the ITFA, and so the company had a significant incentive independent of the Agreement to cease an activity that may be illegal and liability inducing. Of course, the company's collection of such taxes have already attracted a significant number of lawsuits, resulting in the instant MDL. Furthermore, AT&T has an economic incentive independent of potential liability to avoid paying unnecessary taxes. As Dean Klonoff testified at the fairness hearing:

> I don't think AT&T has any strong interest, by the way, right now in starting [to] tax again. I mean, it's a competitive industry. The last thing they want to do is be taxing and turning over money to the state and raising the price of their service. They're just going to have other people looking at their bills and switching companies or having their auditors question it.

It necessarily follows that the $1.98 billion figure overestimates the value of the Settlement to the Class in requiring AT&T to cease collecting the relevant taxes.

It does not follow, however, that the value of the "going-forward" relief provided by the Agreement is zero. It is unlikely that AT&T would have discontinued charging Internet-access taxes on a ubiquitous basis as quickly as it did pursuant to the Settlement. In addition, there is real value to the Class from the fact that the Agreement contractually requires AT&T not to charge those taxes absent a change in the law. The Court therefore finds that the Settlement's provision that requires AT&T to stop charging the challenged Internet Taxes provides significant benefits to the Class, albeit benefits that are less than $1.98 billion. This feature of the Settlement will benefit the Class Members, and thus supports this Court's approving the Agreement.

The Court therefore finds that the Settlement will bestow considerable benefits on the Class Members.

### 2. AT&T Has a Variety of Potentially Meritorious Defenses to the Class Action

Although the Class Members stand to reap considerable benefits from the Settlement, an important question concerns the Class Members' expected recovery should the case proceed to trial vis-à-vis the benefits they will obtain from the instant Settlement. That is, if the Court declined to grant final approval, could the Class Members ultimately expect to obtain more favorable relief?

A dollar recovered today is worth more than a dollar recovered in the future, which is relevant because the Settlement provides for a combination of present and future benefits. (R. 97 at 21-22 (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002)). Were the Class Members required to await the outcome of a trial and inevitable appeal, however, they would not receive benefits for many years, if indeed they received any at all.

Furthermore, Plaintiffs would face considerable hurdles in proceeding to trial. First, Plaintiffs would have to establish that the ITFA permits a private cause of action, even though the statute does not explicitly create one. This argument presents a potentially significant legal challenge for Plaintiffs. (R. 156 at 26-27.) Indeed, the Supreme Court recently reiterated that "implied causes of action are disfavored . . ." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1948 (2009); *see also Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (holding that, without statutory intent as to a private remedy, a "cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute"). Furthermore, not all states' consumer-protection laws permit private rights of action or class actions, which would hinder class certification for trial. (R. 156 at 26 nn. 10-12 (citing IOWA CODE ANN. §§ 714.16 *et seq.*; ALA. CODE § 8-19-10(f); GA. CODE ANN. § 10-1-399; LA. REV. STAT. ANN. §51:1409(a); MISS. CODE ANN. § 75-24-15(4); MONT. CODE ANN. § 30-13-133(a); S.C. CODE ANN. §39-5-140(a)).

Second, AT&T's service agreements contain mandatory arbitration provisions. The only states that AT&T previously pointed to as prohibiting such arbitration agreements are California and Washington. (R. 67 at 27.) On April 27, 2011, however, the U.S. Supreme Court held that the Federal Arbitration Act preempts California law that class waivers in consumer arbitration

agreements are unconscionable if such agreements are in adhesion contracts, disputes between the parties are likely to involve small amounts of damages, and the party with inferior bargaining power alleges a deliberate scheme to defraud. *AT&T Mobility, L.L.C. v. Concepcion*, 131 S. Ct. 1740 (2011). In light of the Supreme Court's recent holding, A&T has a strong argument to compel the Class Representatives to arbitrate their claims, rather than proceeding with their class action. Of course, Class Members subject to mandatory arbitration could not obtain recovery in court. *See, e.g.*, *Fensterstock v. Educ. Fin. Partners*, 611 F.3d 124, 129 (2d Cir. 2010) ("Arbitration replaces the right to go to court, including the right to a jury and the right to participate in a class action or similar proceeding."). The arbitration proceedings would further delay any potential recovery for Plaintiffs.

Third, should Plaintiffs attempt to proceed to trial, they would have to demonstrate the manageability of the case. *Cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial.") (citations omitted). AT&T would argue that proof of its alleged overcharge would require a painstaking jurisdiction-by-jurisdiction factual analysis, as well as legal analysis as to the meaning of "Internet access" and the breadth of the applicable prohibition on taxation of the same. (R. 156 at 29-30.)

Fourth, Plaintiffs would have to demonstrate that each of the jurisdictions in which they seek relief actually prohibited AT&T's tax collections. Defendant observes that tax scholars disagree on how many jurisdictions fall within the ITFA's "grandfather" exemption contained in Section 1104. (R. 156 at 30.) AT&T also points out that New Hampshire, from which the

parties have sought a refund, has indicated an inclination to deny the same because it is grandfathered and thus exempt.  (*Id.* at 30.)  To the extent that any jurisdiction is indeed grandfathered, AT&T's tax collection was not improper and so Plaintiffs would have no claim against the company.  Even putting the grandfather issue aside, in order to recover from Defendant directly, Plaintiffs would have to establish that AT&T is liable for the collections and not merely an agent of the taxing authority.  (*Id.* at 31.)

Furthermore, AT&T would rely on the voluntary-payment doctrine to argue that Class Members who voluntarily paid the disclosed tax charge cannot later recover the same.  (*Id.* at 31 (citing, *inter alia*, *Spivey v. Adaptive Mktg., L.L.C.*, 622 F.3d 816, 821 (7th Cir. 2010).)  AT&T could prevail on such an argument.  *See, e.g.*, *Elmdale Dev., L.L.C. v. City of Des Plaines*, No. 05-CV-1696, 2005 WL 2007184, at *1 (N.D. Ill. Aug. 15, 2005) ("Under the voluntary-payment doctrine, a taxpayer may not recover taxes voluntarily paid, even if the taxing body improperly assessed the taxes absent statutory authorization.  A taxpayer may, however, recover involuntarily paid taxes.  Taxes are paid involuntarily when (1) the taxpayer lacked knowledge of the facts upon which to protest the taxes at the time they were paid or (2) the taxpayer paid the taxes under duress."); *Antosh v. City of College Park*, 341 F. Supp. 2d 565, 569 (D. Md. 2004) ("Maryland law incorporates the 'voluntary payment doctrine' that denies monetary relief to someone who voluntarily paid tax under a mistake of law unless a statutory remedy is provided.").  To the extent Defendant successfully asserted this defense against Class Members, it would bar their recovery.

### 3. The Settlement Is Fair in Light of the Strength of Plaintiffs' Case

The uncertain nature of the legal issues implicated by proceeding to trial makes it

difficult to calculate a precise probability of success. *Cf. Synfuel*, 463 F.3d at 653 ("In conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.'") (quoting *Reynolds*, 288 F.3d at 284-85). Nevertheless, in light of the potentially serious impediments to success that Plaintiffs would experience should they attempt to continue this litigation, the net expected value to the Class Members of following that course is significantly less than the aggregate recoveries sought in the constituent actions in this MDL proceeding. This is because numerous obstacles could undo the litigation, thus leaving either certain Class Members, or all of them, without any relief whatsoever.

The Court concludes that Plaintiffs would face an uphill battle in obtaining their sought-after relief at trial. *Accord* R. 163-3 at 5. Illustratively, having analyzed the nature of the instant case, Dean Klonoff's expert report concluded that, "[c]onservatively, there was at least a 50/50 chance of no recovery." (R. 163-3 at 5.) Viewed from this perspective, the Settlement is generous indeed. Beyond the fact that it has already yielded significant benefits to the Class Members with AT&T's cessation of tax charges—benefits that Dr. Landes calculated as being close to $2 billion to the Class Members alone, which does not include positive spillover effects—the Agreement puts in place a well-thought-out framework for recovering those already-paid charges from the relevant taxing jurisdictions. Indeed, as of April 12, 2011, the parties have requested refunds or credits totaling $1.154 billion. (R. 185-1; R. 185-2.) Furthermore, the fee structure in the present case creates a powerful incentive for Class Counsel to recover the maximum possible refund from each of the taxing jurisdictions.

In short, the Settlement provides value to the Class Members that significantly exceeds their expected recovery from proceeding to trial, which is the key consideration. Plaintiffs

unquestionably would have incurred significant costs in conducting extensive fact discovery, and expert testimony would surely have been necessary. Further, if they prevailed at trial, counsel would likely seek fees equal to a percentage of any recovery. Finally, and as the Seventh Circuit has observed, "[t]he essence of settlement is compromise" and "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

Thus, the "most important factor" in determining whether a proposed settlement satisfies Rule 23—namely the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement," *Synfuel*, 463 F.3d at 653—supports approving the Settlement Agreement in the present case.

### B. The Likely Complexity, Length, and Expense of the Litigation Suggest that the Court Should Approve the Settlement

The Seventh Circuit has held that the likely complexity, length, and expense of continued litigation are relevant factors in determining whether a class-action settlement is fair, reasonable, and adequate. *Synfuel*, 463 F.3d at 653. Those factors strongly support approval of the Settlement Agreement in this case.

If the Court approves the Agreement, the present MDL will come to an end and the Class Members will realize both immediate and future benefits as a result. If the Court denies approval, however, protracted litigation over many years would likely ensue. As Defendant explains, it would first file motions to compel the named Plaintiffs to arbitrate their claims. (R. 156 at 36.) If it were successful in this endeavor, AT&T maintains, the present action would come to a close without any in-court recovery to the Class Members. (*Id.*) The individual

Plaintiffs would then have to arbitrate their respective claims. If its efforts failed, AT&T suggests that it would file an interlocutory appeal under Section 16 of the Federal Arbitration Act, which would stay proceedings in this Court. (*Id.* (citing *Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*, 128 F.3d 504, 506 (7th Cir. 1997).) If AT&T's arbitration efforts did not succeed, it likely would file a motion to dismiss. Plaintiffs would also file a motion to certify the class—a doubtless contested issue under Federal Rule of Civil Procedure 23. The parties would also engage in complex discovery, which would have to address the nuanced factual questions attendant upon each taxing jurisdiction. The costs associated with discovery in complex class actions can be significant. *See, e.g.*, Nicola Faith Sharpe, *Corporate Cooperation Through Cost-Sharing*, 16 MICH. TELECOMM. & TECH. L. REV. 109, 110 (2009) ("Discovery accounts for about 50% of all litigation costs and up to 90% of the costs in the top 5% of the most expensive case.") (citation omitted).

If the case were to survive the summary-judgment stage, it would proceed to trial. Dean Klonoff provided uncontested testimony that proceeding to trial would be an "uphill battle" that would go on for "many years." Given the complex factual issues implicated by this MDL, a trial would be both lengthy and expensive. Furthermore, the JPML transferred the relevant cases to this Court "for coordinated or consolidated *pretrial* proceedings." (R. 1 at 3 (emphasis added).) Thus, following discovery, there is some possibility that the individual cases would return to the jurisdictions where they started. Following trial (or a series of different trials), given the stakes at issue, it is almost certain that the losing party would appeal.

In contrast to this drawn-out, complex, and costly litigation process, which would provide Class Members with either no in-court recovery or some recovery many years from now,

the Settlement both brings to a close the complained-of behavior by AT&T and puts in place a realistic mechanism for recovering the relevant Internet charges. As a result, the likely complexity, length, and expense of continuing this litigation strongly support approving the Settlement.

### C. The Fact of Scant Opposition to the Settlement Supports Approval

The Seventh Circuit has instructed district courts to evaluate the amount of opposition to a settlement among affected parties in deciding whether to approve a class-action settlement. *Synfuel*, 463 F.3d at 653. A very small percentage of affected parties have opposed the Settlement Agreement. Only 235 out of over 32 million Class Members have opted out, which is less than 0.01%. (R. 156 at 38.) Class Members have filed only 10 objections with specific arguments. (*Id.*) Such a remarkably low level of opposition supports the Settlement. *See, e.g.*, *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlement"), *aff'd*, 267 F.3d 743 (7th Cir. 2001); *cf. The Authors Guild et al. v. Google, Inc*., -- F. Supp. 2d --, 2011 WL 986049, at *6 (S.D.N.Y. Mar. 22, 2011) (denying approval of Google's class action, in part because "an extremely high number of class members—some 6800—opted out" and because "the objections [were] great in number"). As Dean Klonoff testified at the fairness hearing, in a settlement with this many potential class members, there are typically "thousands of opt-outs."

Below, the Court considers the substantive objections that a small subset of Class Members have filed, and finds that they do not warrant denying approval. Beyond the fact that these objections do not raise significant concerns, it is illuminative that only a tiny fraction of the

Class Members saw fit to opt out or to object. This factor supports approval.[10]

### D.    The Opinion of Competent Counsel Supports Approval

The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23. *Synfuel*, 463 F.3d at 653. In its prior decision granting preliminary approval of the Settlement, the Court observed that "counsel for Defendant and Interim Settlement Class Counsel are highly competent" and noted that "there is no indication that the Proposed Settlement Agreement is the victim of collusion." (R. 97 at 26.) The Court sees no reason to revisit that determination. Class Counsel believe that the Settlement is beneficial to the Class and meets the class-certification requirements of Rule 23. (R. 163 at 63.)

In addition, Dean Klonoff, an expert on class actions, explained in considerable detail why, in his reasoned opinion, the Settlement meets the requirements of Rule 23. (R. 163-3.) He testified that it is "one of the best settlements" he had ever seen and that it was "exceptional." Also, as Mr. Robertson testified, there are 92 lawyers involved in implementing the refund process under the Settlement. He explained that there are 44 different contingency agreements to the effect that "all of these local-counsel law firms . . . will get a percentage of the fee for that state in which they have undertaken the representation." Dean Klonoff separately noted that the "lawyers from across the country representing sub classes have done their own due diligence."

The Court thus finds that the opinion of competent counsel in this case supports its

---

[10] Of course, the various states that have filed amicus briefs challenging the Settlement are also "affected" by the Settlement. The Court considers the merits of their arguments below, but notes here that states' hostility to the Settlement is in some respects unsurprising given that they are the entities from which the parties will seek reimbursement. As the Court previously explained in its opinion granting preliminary approval, this case is "unique" in that "AT&T essentially acts as a pass-through . . . to taxing authorities who [*sic*] will ultimately make substantial payments directly to the class members." (R. 97 at 27-28.)

approval of the Settlement. *Accord Retsky Fam. Ltd. v. Price Waterhouse L.L.P.*, No. 97-CV-7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) ("[T]heir opinion that the settlement is fair, reasonable and adequate also favors approval of the settlement.").

E.        **The Stage of the Proceedings and the Amount of Discovery Completed at the Time of Settlement Support the Settlement**

The last factor that the Seventh Circuit deems relevant to the question whether a class-action settlement is fair, reasonable, and adequate concerns the stage of the proceedings and the amount of discovery completed. *Synfuel*, 463 F.3d at 653. This factor is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

Although no formal discovery has taken place in this MDL litigation prior to the parties' entering into the Settlement Agreement, the parties have nevertheless engaged in considerable, extensive informal discovery. (R. 156 at 40; R. 163 at 61.) Class Counsel obtained information about all the relevant issues during the half-year-long settlement negotiations, which included finding out: (1) whether AT&T paid the taxes to the relevant taxing authorities or kept the money for itself; (2) the number of consumers involved; (3) which services were Internet-access services; (4) how much money AT&T collected as taxes for those services; (5) to which jurisdiction AT&T paid the taxes, in what amount, and when; (6) whether Defendant could identify the customers whom it charged; (7) whether one could break down such customer-specific data; (8) how AT&T made the mistake of charging the pertinent taxes; (9) how long it would take AT&T to cease collecting the relevant taxes; (10) what information Defendant kept about its former customers; and (11) how much vendor's compensation AT&T retained and from

50

whom. (R. 163 at 61.) Moreover, the testimony at the fairness hearing established that AT&T provided such information to Class Counsel in an orderly manner, rather than dumping large amounts of discovery information on them and requiring them to shift through and find the pertinent facts. AT&T also gave Class Counsel access to certain key employees who could answer relevant questions.

Such information is more than sufficient to enable the Court and the parties to evaluate Plaintiffs' claims. As the Court previously determined in preliminarily approving the Settlement, "this factor does not weigh against approval." (R. 97 at 27.) Indeed, it is not clear how formal discovery would have produced appreciable benefits to the Court and to the parties that the informal discovery conducted by the parties did not bestow. Conversely, though, there would have been considerable costs to Class Counsel, AT&T, and hence to the Class Members of engaging in formal discovery. As the Southern District of New York has noted:

> [T]he question that this Court must answer is not how much or how little discovery was completed by the parties before they agreed to the settlement, but rather whether the discovery that was completed was sufficient for 'effective representation.' . . . Intervenors . . . have not explained how additional discovery would have been in the interest of the class. Discovery has costs, and further discovery would have taken additional time and resulted in the expenditure of additional funds on both sides, neither of which is in plaintiffs' interests. . . . [C]lass counsel's decision to forgo additional discovery in the hopes of minimizing costs and achieving a quick recovery for their clients appears to be both fair and reasonable[.]

*McBean v. City of New York*, 233 F.R.D. 377, 384-85 (S.D.N.Y. 2006). Indeed, the label of "discovery" is not what matters. Instead, the pertinent inquiry is what facts and information have been provided.

For these reasons, the stage of the proceedings and the amount of discovery completed support this Court's approving the Settlement Agreement. *See In re Elan Secs. Litig.*, 385 F.

Supp. 2d 363, 370 (S.D.N.Y. 2005) ("[T]he stage of the proceedings and the amount of discovery completed' . . . also supports the Settlement. Although there has been little or no formal discovery to date, Class Counsel has, among other things, interviewed former Elan employees, received and analyzed hundreds of thousands of pages of documents and deposition summaries produced by Elan in connection with the SEC investigation, worked with forensic accountants to evaluate the alleged financial improprieties, and retained two experts to analyze potential damages."); *see also Molski v. Gleich*, 318 F.3d 937, 959 (9th Cir. 2003) ("Early dispute resolution is salutary, and we should not encourage the unnecessary expense, delay, and uncertainty caused by lengthy litigation when the parties are prepared to compromise. Nor should we hold . . . that a prompt settlement necessarily suggests a failure to prosecute or defend the action with due diligence and reasonable prudence. To the contrary, an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of the strength and weaknesses of their positions and of the interests to be served by an amicable end to the case.") (Graber, J., concurring), *overruled by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010).

## II.     Objections to the Settlement Are Misplaced

For the preceding reasons, the five factors outlined by the Seventh Circuit support approving the Settlement Agreement. Nevertheless, Class Members have filed ten objections, which collectively articulate a number of specific arguments why the Court should not approve the Settlement. The Court now addresses these arguments in turn.

### A.          The Class Members' Objections Are Not Well Founded

Above, the Court discussed each Objector's respective opposition to the Settlement. It now considers, in turn, each substantive argument raised by the Objectors. None of them warrants denying approval.

### 1. It is not an impediment to settlement that an employer previously reimbursed a Class Member employee for the Internet-access taxes

One objection asserts that the Settlement will improperly benefit employees who paid the relevant taxes, but whom their employers separately reimbursed. (R. 136.) Objector Douglas W. Cherry proposes that, in such cases, the parties should reimburse the employers instead of the employees, as the former are the true parties in interest. (*Id.* at 2.)

This objection is not an obstacle to approving the Settlement. If employees of a company were AT&T customers against whom Defendant charged Internet Taxes during the relevant period, then they are Class Members. (R. 97 at 34.) If third-party employers subsequently reimbursed Class Members for the pertinent tax charges, then the question whether such Class Members must in turn reimburse their employers is a separate matter involving a question of law and equity between the employer and employee.

### 2. Notice was sufficient

A number of Objectors argue that the notice effected by AT&T was deficient. (R. 116; R. 147; R. 151; R. 132.) Paige Nash submits that due-process considerations, as well as the decisions of *Mullane v. Ctrl. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), and *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), require that each Class Member in fact receive personal notice. (R. 147 at 1.) Shelley Stevens echoes this view. (R. 151.)

These objections are misplaced. Due process does not require that every class member receive notice. *See, e.g.*, *In re VMS Ltd. P'ship Secs. Litig.*, No. 90-CV-2412, 1995 WL 355722,

at *1 (N.D. Ill. June 12, 1995) ("The dictates of due process do not require that every class member actually receive notice."); *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) ("[T]he due process clause does not amount to a guarantee of notice to a class member."); *Carlough v. Amchem. Prod., Inc.*, 158 F.R.D. 314, 325 (E.D. Pa. 1993) ("Receipt of actual notice by all class members is required by neither Rule 23 nor the Constitution."); *In re Nat'l Life Ins. Co.*, 247 F. Supp. 2d 486, 492 (D. Vt. 2002) ("An alleged failure to receive notice will not sustain a due process challenge as long as reasonable measures were taken to provide individualized notice to identifiable class members."); *see also Burns v. Elrod*, 757 F.3d 151, 157 (7th Cir. 1985) ("While defendants did not have to exhaust every conceivable method of identification, they were required, within the limits of practicability, to send such notice as was reasonably calculated to reach most interested parties."). Indeed, the Supreme Court in *Mullane* itself made this clear: "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections . . . [I]f with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied." *Mullane*, 339 U.S. at 314-15.

In the present case, notice was more than adequate both under Rule 23 and as a matter of due process. In October 2010, AT&T mailed notice to its 22.5 million then-existing customers with their bills, which included a Spanish translation where relevant. (R. 156 at 20.) The following month, AT&T sent notice by text message to more than 32-million Class Members who were customers as of September 14, 2010. (*Id.*) AT&T published notice on November 16

and 23, 2010, in the national edition of *USA Today*. (*Id.* at 21.) On December 15, 2010, the notice administrator sent an e-mail notice to over one-million former customers and a postcard notice to over nine-million former customers. (*Id.* at 21.)

Karen Wiand contends that notice was inadequate because "it has been sent to consumers via text message where it is clear that many consumers have not received this text." (R. 116 at 6, 34.) In support, Ms. Wiand proffers the declarations of four AT&T cell-phone customers who had internet access as part of their plan and who declare that they "have no recollection of receiving, nor does [their] review of recent messages reveal, a text message from AT&T advising me of a lawsuit settlement involving AT&T[.]" (R. 116-3.) In the first place, these declarations do not state that the four customers did not actually receive the messages. Second, Ms. Wiand does not explain why an imperfect sending of text-message notice would, when viewed in light of the other forms of notice AT&T provided to Class Members, fall short of that required by Rule 23 or due process. Furthermore, AT&T has produced compelling evidence that it sent text messages to at least three of these four customers. (R. 156-3.) Ms. Wiand's argument that notice was inadequate fails.

### 3.	The objection deadline did not precede the attorney-fee-application deadline

Travis Cox and Margaret Johnson have objected that "Class Counsel will not file an attorney fee application prior to the objection deadline on March 10, 2011." (R. 132 at 3.) Citing *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010), they argue that "rule 23(h) and due process require the fee motion to precede the objection deadline." (*Id.* at 4.) Paige Nash similarly objects that, "[a]s the case is now scheduled, the fee petition will be filed after the objection deadline. This sequence of events violates due process, the express terms of

Fed. R. Civ. P. 23(h) and the decision in" *In re Mercury*. (R. 147 at 2.)

These objections are misplaced. The Court required Class Members to file objections by February 2, 2011, and Class Counsel to file its application for Class Representatives' fees, attorneys' fees, costs, and expenses by January 26, 2011. (R. 108 at 1-2.) Class Counsel in fact filed its motion for approval of attorneys' fees, costs, and expenses, and for approval of incentive awards on January 26, 2011. (R. 124.) Objectors are therefore incorrect that Class Counsel did not file an attorney-fee application prior to the objection deadline.

### 4. The class definition is sufficiently definite

Mike Hale, Summer Hogan, Michael Schulz, and Omar Rivero object that the class definition is "failsafe" because it defines the class "in terms of those who were charged a 'tax on internet access' as that expression is defined under the Internet Tax Freedom Act." (R. 141 at 2.) They argue further that "[t]his is a definition of the class that depends on the determination of an ultimate merits issue in this case, i.e., whether a particular charge meets the definition of a tax on internet access under the ITFA." (*Id.*)

The Court disagrees. As a threshold matter, the Objectors do not articulate an alternative class definition that would be simultaneously efficacious and free of the alleged "failsafe" problem. More fundamentally, however, the class definition is sufficiently definite that the Court can readily determine whether a particular individual is indeed a Class Member. *See, e.g.*, *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (observing that a class must be sufficiently definite that one can ascertain the class members); *cf. Sadowski v. Med1 Online, L.L.C.*, No. 07-CV-2973, 2008 WL 489360, at *3 (N.D. Ill. Feb. 20, 2008) ("If a class definition requires 'the court to conduct an inquiry into the merits of each class member's claim,' then it is

not sufficiently definite.") (quoting *Pastor v. State Farm Mut. Auto. Ins. Co.*, No. 05-CV-1459, 2005 WL 2453900, at *2 (N.D. Ill. Sept. 30, 2005), *aff'd*, 487 F.3d 1042 (7th Cir. 2007)).

The definition in the present case encapsulates "[a]ll persons or entities who are or were customers of AT&T Mobility and who were charged Internet Taxes on bills issued from November 1, 2005 through the final date on which AT&T Mobility issues bills to customers prior to implementing the billing system changes pursuant to Section 8.1." (R. 97 at 34-35.) The Court can readily ascertain the Class Members from this class definition, and so the Court discerns no problem with it.

With respect to the Subclasses, which make reference to those "who were charged Internet Taxes," the Court does not discern a significant problem. The Agreement defines "Internet Taxes" as "every 'tax on Internet Access,' as that terms is defined in the ITFA, collected by AT&T Mobility from its customers and paid to the Taxing Jurisdictions[.]" (R. 50-3 at 10.) The Court need not determine, however, whether AT&T violated the ITFA with respect to each of Defendant's customers to conclude whether those customers are Class Members. It need not conclude whether any of the substantive defenses that AT&T could raise apply with respect to any consumer. Because the Court can readily identify the identity of those who comprise the Class, the class definition is proper. *Cf., e.g.*, *G.M. Sign, Inc. v. Brink's Mfg. Co.*, No. 09-CV-5528, 2011 WL 248511, at *10 (N.D. Ill. Jan. 25, 2011) ("[T]he proposed class definition . . . closely track[s] the language of the relevant statute. In many respects, the Court's demarcating the boundaries of the class, and identifying the individuals who comprise it, would be tantamount to resolving the merits of the underlying action."); *Nudell v. Burlington N. & Santa Fe Ry. Co.*, No. A3-01-41, 2002 WL 1543725, at *3 (D.N.D. July 11, 2002) (finding a

class definition impermissible because "individual questions abound . . . many of them related to the ultimate issues of liability at issue in the case . . . . [E]ven accepting that the definition might not lead to the classic failsafe class, it still too closely identifies the class definition with a merits determination").

### 5. The class notice properly states that objectors may be subject to depositions

Mike Hale, Summer Hogan, Michael Schulz, and Omar Rivero object to the statement in the class notice that objectors may be subject to depositions.  (R. 141 at 2.)  They do not explain why this feature of the class notice is objectionable.  *Cf., e.g.*, *Stern v. AT&T Mobility Corp.*, No. 10-CV-85, 2011 WL 607135, at *1 (N.D. Ohio Feb. 11, 2011) (observing that "the California judge presiding over the class action suit . . . allowed objectors to be deposed"); *see also* Fed. R. Civ. P. 30(a)(1) ("A party may, by oral questions, depose any person[.]").  Indeed, they concede that "it may be true" that objectors can be subject to depositions.  (*Id.*)  Their hostility to this element of the notice is that "to include this language in a class notice serves the purpose only of discouraging objections."  (R. 141 at 2.)

This is not a well-founded objection.  Apprising objectors of their legal rights and obligations is entirely proper, even if such notification has a marginal deterrent effect.  Moreover, the objectors have not presented any evidence that this notice deterred anyone from objecting, including themselves.

### 6. Proponents of the settlement have carried their burden of establishing that the settlement is reasonable, adequate, and fair

A further objection is that the proponents of the settlement have failed to carry their burden of establishing that the settlement is reasonable, adequate, and fair.  (R. 141 at 2-3.)  For

58

the reasons discussed in detail above, the Settlement Agreement meets each of the five factors highlighted by the Seventh Circuit in *Synfuel Techs*. The Agreement promises to yield significant benefits to the Class Members, and those benefits exceed the expected return to Plaintiffs of proceeding to trial. Viewed from this perspective, the strength of Plaintiffs' case compared to the amount of AT&T's settlement offer strongly supports approval. In addition, continuing the litigation would doubtless involve a protracted, complicated, and expensive process, which also counsels approval. Furthermore, opposition to the Settlement has been very light, and both the opinion of competent counsel and the informal discovery completed to date warrant approval. For these reasons, the parties have indeed carried their burden of demonstrating that the Settlement is reasonable, adequate, and fair.

7. **The possibility that there may be a disparity in the refunds that Class Members of different states receive does not warrant denying approval**

Another objection is that "there may or will be a potential disparity of [*sic*] the refunds between members of different states." (R. 141 at 3.) This is not a creditable objection to the Settlement.

The circumstances surrounding this litigation are obviously complex, as several states display idiosyncracies that are material to recovery of the Internet-tax charges. Key features of the Settlement, however, include the fact that it utilizes distinct procedures for different groups of states that impose differing refund requirements and the fact that it ties attorney compensation directly to the amount of money realized for the class. These features create an incentive framework that promises to maximize value to the Class Members. To the extent an asymmetry arises between the refunds earned by Class Members of different states, that phenomenon would

likely be the result of those states' differing rules, procedures, and laws. It would not be the result of a systemic flaw in the Settlement itself. Because the Agreement puts in place a realistic framework for recovering the greatest possible amount for the Class Members, the possibility that Class Members of some states will benefit proportionally more than others is not an impediment to approving the Settlement. Such an outcome would simply reflect the unremarkable fact that some states may prove more receptive to the refund requests than others.

> **8.** **The class notice provides sufficient information about the fees sought by Class Counsel**

A number of objectors contend that the class notice was inadequate because it did "not provide sufficient information by which one [could] determine the actual dollar amount of fees sought by counsel." (R. 141 at 3.) Shelley Stevens objects: "The attorney fees are unknown to me. How can I decide whether to agree to the attorney fees when I do not know how much they will be or what work has been done to earn them[?]" (R. 151 at 2.)

It is true that notice of attorneys' fees is a constituent part of an effective class notice. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 963 n.15 (9th Cir. 2003) ("Notice of the amount of fees serves as 'adequate notice of class counsel's interest in the settlement.'") (quoting *Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)). In the present case, however, the mailed notice provided that Class Members could obtain "a more detailed description of the terms of the proposed Settlement and to read the full Notice of Proposed Class Action Settlement, which more fully describes your rights" by visiting "the website, www.attmsettlement.com" or by calling a 1-800 number. (R. 97 at 32-33.) The Notice of Pendency of Class Action, Proposed Settlement and Hearing provided the following information on attorneys' fees:

> Settlement Class Counsel will apply to the Court for an award of reasonable attorneys' fees and expenses and Class Representatives' compensation.
>
> Settlement Class Counsel plan on seeking an order approving attorneys' fees that reflect the results obtained and the work and effort required finally to obtain recoveries for the Settlement Class, and will seek such recovery from the funds obtained for the Settlement Class. Settlement Class Counsel agree that they will seek a fee no greater than the lesser of ten percent (10%) of the aggregate value of the Settlement or twenty-five percent (25%) of the amounts refunded by taxing jurisdictions to the Settlement Class. Settlement Class Counsel also will seek reimbursement for their reasonable out-of-pocket expenses incurred in pursuing this litigation on behalf of the Settlement Class from funds obtained for the Settlement Class under the Settlement Agreement. Finally, Settlement Class Counsel will seek compensation to the Class Representatives in an amount not to exceed $5,000 for each state-specific subclass representative from the funds obtained for the Settlement Class.

(R. 50-3 at 108.)

Objectors contend that this information is inadequate because it does not lend itself to an identifiable dollar figure. (R. 141 at 3; R. 151 at 2.) The parties could not realistically include such information, however, because the attorneys' fees depend on the amount Class Counsel successfully obtain for the Class Members. This is not a problematic feature of the Settlement, but an attractive one. *Cf. Staton v. Boeing Co.*, 327 F.3d 938, 963 n.15 (9th Cir. 2003) ("Where the class was informed of the amount of fees only indirectly and where the failure to give more explicit notice could itself be the result of counsel's self-interest, the courts must be all the more vigilant in protecting the interests of class members with regard to the fee award."). As the Court previously observed, the present case is in many respects unique. (R. 97 at 27-28.) Except for the so-called "vendor's compensation," which it will return pursuant to the Agreement, AT&T did not keep the taxes that it collected. Instead, the company acted as a conduit for the relevant taxing jurisdictions. (*Id.*) It is a positive feature of the Settlement Agreement that it does not create a set dollar amount in fees for counsel. Such a fixed reward

would create an incentive for Class Counsel to recover a sufficient amount in refunds to cover their own compensation, but considerably weaker incentives to recover more.

Ultimately, the fact that the class notice enabled Class Members to learn that Class Counsel would seek "a fee no greater than the lesser of ten percent (10%) of the aggregate value of the Settlement or twenty-five percent (25%) of the amounts refunded by taxing jurisdictions to the Settlement Class" constituted adequate notice. *Cf., e.g.*, *In re Bisys Secs. Litig.*, No. 04-CV-3840, 2007 WL 2049726, at *1 (S.D.N.Y. July 16, 2007) (observing that "no class member was on notice of the actual attorneys' fees requested at the time objections were due" but noting that "members of the class were plainly on notice that the attorneys' fees might be as much as one-third of the fund and so had every reason to raise an objection if they thought this was excessive"); *see also Hartless v. Clorox Co.*, -- F.R.D. --, 2011 WL 197542, at *11 (S.D. Cal. Jan. 20, 2011) ("Objector Newman contends that the class has not been provided any information regarding the details of the fee request. Class counsel, however, indicated on the class notice that it would be filing its motion for attorneys' fees on or around November 22, 2010 and the document would be available via the website or mail by calling the toll-free number. Thus, the class members could have obtained a copy of the documents filed in support of the motion for attorneys' fees by calling the toll free number.").

> **9.     The class notice contained sufficient information concerning Class Members' options**

Shelley Stevens objects to the class notice because "the post card I received did not tell me any of the options nor did it tell me the deadline dates for objecting, opting out or even filing a claim." (R. 151 at 2.) This objection is unavailing. The text-message notice provided: "NOTICE OF CLASS ACTION SETTLEMENT – You may be entitled to benefits under a class

action settlement.  Go to www.attmsettlement.com or call [the 1-800 number]."  (R. 50-3 at 99.)

Both the website and 1-800 number provided detailed information concerning Class Members'

options, as well as the various deadlines.  The postcard notice was more than sufficient.  *See,*

*e.g.*, *In re Mut. Funds Inv. Litig.*, No. 04-CV-15861, 2010 WL 2342413, at *7 (D. Md. May 19,

2010) (approving use of postcard notice); *Larson v. Sprint Nextel Corp.*, No. 07-CV-5325, 2010

WL 234934, at *7-8 (D.N.J. Jan. 15, 2010) (same).

> **10.     The class notice sufficiently disclosed the amount of expenses and
> costs for which the attorneys seek reimbursement**

A further objection is that "the class notice is inadequate in that it does not disclose the

amount of expenses and costs sought to be reimbursed[.]"  (R. 141 at 3.)  The Notice of

Pendency of Class Action, Proposed Settlement and Hearing provided that "Settlement Class

Counsel . . . will seek reimbursement for their reasonable out-of-pocket expenses incurred in

pursuing this litigation on behalf of the Settlement Class from funds obtained for the Settlement

Class under the Settlement Agreement."  (R. 50-3 at 108.)  Thus, although the class notice did

not provide the specific dollar figure that Class Counsel would seek in expenses and costs, it did

apprise Class Members of the fact that Class Counsel would seek those sums.  (*Id.*)  Class

Counsel subsequently filed its motion for costs and expenses on January 26, 2011.  (R. 124.)

This date was before the deadline for filing objections of February 2, 2011.  (R. 108 at 2.)

The Class Notice was sufficient with respect to the costs and expenses that Counsel

would likely seek.  *Cf., e.g.*, *In re Mut. Funds Inv. Litig.*, Nos. 04-MD-15863, 04-CV-560, 2010

WL 4780244, at *2 (D. Md. Nov. 15, 2010) ("The mere fact that the class notice stated only that

Plaintiffs' Counsel would seek 'reasonable out-of-pocket expenses' does not make the notice

inadequate under the PSLRA. . . . [T]he failure to assign a numerical value to projected expenses

constitutes a much less egregious oversight - if, indeed, it is an oversight at all.  Unlike the *Delphi* case, the Putnam class members here were still informed that Plaintiffs' Counsel would seek 'reasonable out-of-pocket expenses,' and they had the opportunity to object to this provision.  Thus, the content of the Putnam class notice was adequate under the PSLRA.").

> **11.  Proponents of the settlement have discharged their burden of proof on commonality, typicality, and predominance**

Numerous objectors contend that proponents of the settlement have failed to discharge their burden of proof on commonality, typicality, and predominance.  (R. 141 at 3; R. 156-4 at 13-14; R. 151 at 2.)  Objectors Mike Hale, Summer Hogan, Michael Schulz, and Omar Rivero make this assertion gratuitously, without offering any explanation as to why the certified Class does not meet these certification requirements.  (R. 141.)  Separately, Margaret Strohlein argues that the diversity of the Class, with its many differing causes of action, "will prove to be very difficult" and, "[a]s a result, issues of predominance under 23(b) arise."  (R. 156-4 at 13.)  She further contends that the divergent remedies in different states render claims in some jurisdictions more valuable than others, thus defeating predominance.  (*Id.*)

These objections fail.  Notably, the Court certified the present Class for settlement purposes only.  (R. 97 at 16.)  It is true that "[s]ettlement does not relieve the Court of its duty to perform a robust analysis of the plaintiffs' predominance showing."  *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139 (S.D.N.Y. 2008).  The Supreme Court has made clear, however, that "settlement is a factor in the calculus" whether "certification is proper." *Amchem*, 521 U.S. at 623.

The Supreme Court has explained that the "Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

*Amchem*, 521 U.S. at 623. The Court previously concluded that the allegation that AT&T's standardized conduct violated laws common within each subclass demonstrates that the Class and Subclasses will be cohesive. (R. 97 at 16.) The Court sees no reason to revisit that conclusion.

Although it is true that the Supreme Court in *Amchem* found that a class certified for settlement failed the predominance requirement of Rule 23, that finding was based on the myriad disparate questions that proved fatal to class cohesion. *Amchem*, 521 U.S. at 623. Specifically, in that case, "[c]lass members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma. . . . Each has a different history of cigarette smoking, a factor that complicates the causation inquiry." (*Id.* at 623) (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996)).

The present MDL is eminently distinguishable, and the certified settlement Class does not present comparable difficulties to cohesion. The major issues in the class action are applicable to the class as a whole. Plaintiffs' claims all arise from the same alleged conduct of AT&T, namely the improper charging and collecting of taxes over "Internet access." The claims also involve the interpretation of the ITFA. The fact that the claims also implicate the laws of different states does not defeat predominance for the purpose of certifying a settlement class. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529-30 (3d Cir. 2004) ("Although there may be situations where variations in state laws are so significant so as to defeat . . . predominance even in a settlement class certification, this is not such a case. We agree . . . that

the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 315 (3d Cir. 1998) ("We . . . reject Krell's contention that predominance is defeated because the class claims are subject to the laws of the fifty states."). Ultimately, "the instant action presents more than a mere common interest in a fair compromise." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 239 (S.D. W. Va. 2005). The Court abides by its conclusion that the certified class meets the predominance requirement of Rule 23.

### 12. The class definition is not vague and ambiguous

A number of objectors contend that the class definition is vague and ambiguous, and is not tied to objective criteria. (R. 141 at 3.) The Court does not agree. As explained above, the class definition is both clear and objective, being comprised of "[a]ll persons or entities who are or were customers of AT&T Mobility and who were charged Internet Taxes on bills issued from November 1, 2005 through the final date on which AT&T Mobility issues bills to customers prior to implementing the billing system changes pursuant to Section 8.1." (R. 50-3 at 14.) The objectors do not explain how this definition is vague and/or ambiguous. Nor can the Court discern a basis by which to reach such a conclusion.

### 13. The parties properly reached a settlement without the benefit of formal discovery

Several objectors take issue with the fact that the parties have reached a settlement without the benefit of formal discovery. (R. 116 at 3; R. 132 at 2; R. 156-4.) Karen Wiand submits that "[c]lass counsel has proposed to settle without having discovered the amount of money at issue, without determining which states will pay refunds [and] without determining the

specific actual procedure for refunds[.]" (R. 116 at 3.) Travis Cox simply asserts, without explanation as to the basis for his objection, that "[t]he settlement has been reached without any formal discovery." (R. 132 at 2.) Margaret Strohlein contends that, without discovery, there is no way to know whether settlement will be of greater benefit to the Class Members than continuing the litigation. (R. 156-4 at 4.)

In fact, the informal discovery in this case is more than adequate to allow both the Court and the parties to make informed judgments with respect to the Settlement. The informal discovery has been extensive. Indeed, and as explained in detail above, requiring formal discovery would entail significant expenditures in resources and time—both at cost to the Class Members—with limited marginal value. The lack of formal discovery is not an impediment to approval of the Settlement.

### 14. The fact that some states currently face difficult financial situations is not an impediment to the Settlement

A number of Class Members object to the Settlement on the ground that, given some states' budget deficits, it is unlikely that some states will give refunds. (R. 132 at 2-3.) The Court does not consider this to be a valid objection. If the law obliges particular taxing jurisdictions to issue refunds, it is reasonable for the Court to assume that states will comply with the law. Defendant also points out that it is common for states to issue future tax credits, which the Agreement provides for. (R. 156 at 11.) In addition, to the extent that a number of states are currently penurious, then former and current AT&T customers who attempt independently to procure refunds from the state would face exactly the same problem that the parties will have to tackle pursuant to the Settlement. Furthermore, the Settlement provides for appeal procedures if taxing authorities refuse to pay refunds. (R. 50-3 at 19.)

### 15. Class Counsel will not neglect Class Members of certain states in favor of customers in those states in which counsel will receive large fees on refunds

A number of Class Members contend that "class counsel will receive large fees on refunds from some states even if AT&T customers in other states receive little if anything. The result is some AT&T customers will be sacrificed in favor of AT&T customers in other states." (R. 132 at 3.) Objector Karen Wiand shares this concern. (R. 116 at 3.)

The Court is satisfied that the parties have structured the Settlement Agreement in such a way that Class Counsel do not have an incentive to abandon Class Members who are residents of less lucrative states in favor of those in which higher refunds are owed. The extent of each local Plaintiffs' lawyer's compensation depends on the amount that lawyer recovers for the relevant Subclass. As noted previously, "class counsel will only be paid from state-specific escrow accounts if those accounts are funded through refunds or credits from the taxing jurisdictions[.]" (R. 97 at 26.) It is also relevant that the parties have already requested refunds from all the taxing jurisdictions. (R. 164 at 11.)

### 16. The Settlement does not violate the parties' contracts, which provide that the parties would resolve all disputes between them through arbitration

A small number of Class Members object to the Settlement on the ground that it violates the parties' contract. (R. 143 at 2-4, 7.) They point out that the contract between AT&T and the Class Members provides that they "agree to arbitrate all disputes and claims between us" and that they are "waiving the right . . . to participate in a class action." (*Id.* at 2.) The Settlement Agreement, the objectors submit, is improper because the arbitration provision "prevents ATTM from resolving a dispute through a court or class action." (*Id.*)

68

This objection misconceives the nature of the present Class Action. AT&T is free to attempt to enforce the arbitration provision against the Class Representatives and other Class Members, but has elected to waive that right as part of the Settlement Agreement. (R. 156 at 16.) Class Members also had the right to enforce the arbitration provision. Those who agreed to the Settlement Agreement by not opting out, agree—like AT&T—not to enforce that provision. Those Class Members who wished to enforce their right to arbitration could have done so by opting out. Ultimately, the objectors are mistaken in asserting that an arbitration agreement prevents the parties to the same from ever reaching a subsequent agreement. *See, e.g.*, *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 695 (7th Cir. 2009) ("[P]arties to an arbitration agreement can always waive the agreement and decide to duke out their dispute in court.").

The objectors also submit that the Federal Arbitration Act ("the FAA") requires the Court to enforce the arbitration agreement. (R. 143 at 4-5.) They quote Section 3 of the FAA to the effect that, "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" (*Id.*) (quoting 9 U.S.C. § 3.) As AT&T correctly points out, however, this provision clearly requires that a party make an application to the relevant court. (R. 156 at 56.) The FAA does not impose an affirmative obligation on courts to compel arbitration independent of any application by a party.

**17.      The Settlement puts a well-thought-out process in place for AT&T to obtain refunds from states that require a person seeking a refund first**

**to refund all relevant taxes and interest to the person from whom the taxes were collected**

Angela Vrana and Barbara M. Fisher object that the Settlement Agreement will not realize refunds for Class Members in certain states. (R. 143 at 8-9.) They submit that, under Texas law, AT&T will not be able to obtain a refund unless it first refunds "all the taxes and interest to the person from whom the taxes were collected." (R. 143 at 8 (quoting TEX. TAX CODE § 111.104(f).) They point out that, under the Agreement, AT&T will pay the amount of the refunds into a "Pre-Refund Escrow Fund." (*Id.* at 8-9.) They further observe that the name of the fund itself demonstrates that money deposited within it is not a refund to consumers, but rather a "pre-refund," and further contend that Class Members have no rights with respect to the money in that fund. (*Id.* at 9.) These objections thus assert that Texas will not issue a refund. (*Id.*)

The Agreement has put in place a mechanism for obtaining refunds from those jurisdictions that condition granting refunds in the above-mentioned manner. (R. 50-3 at 17-20.) In such settings, the Agreement requires AT&T to pay an amount equal to the refund to the Pre-Refund Escrow Fund contemporaneously with the filing of a refund claim. (*Id.* at 17.) The parties agree that "the payment by AT&T of an amount representing Internet Taxes paid by that Settlement Class Member into the Pre-Refund Escrow Fund will be considered the payment by AT&T of such taxes to such Settlement Class Member." (*Id.*) Contrary to Vrana's and Fisher's contention the Class Members will have no rights with respect to the money in the Pre-Refund Escrow Fund, the Agreement provides that, "[w]ith respect to those refund claims filed in the name of AT&T Mobility, to the extent that the Taxing Jurisdiction grants AT&T Mobility a refund, AT&T Mobility shall assign all of its rights . . . in the refund to the members of the

Settlement Class." (*Id.* at 20.)

Ultimately, there is no absolute guarantee that taxing authorities in states with such laws will prove receptive to the refund procedures outlined in the Settlement Agreement. Nevertheless, the parties have put in place a well-thought-out procedure that appears to satisfy these jurisdictions' requirements. The Court is also encouraged by two further features of the Settlement Agreement. First, "Class Counsel . . . agree to take any action reasonably necessary on behalf of the Settlement Class to satisfy a Taxing Jurisdiction that such amounts have been refunded to the affected customers in satisfaction of the Taxing Jurisdiction's requirement, in order to facilitate a refund or credit of the Internet Taxes to AT&T Mobility." (R. 50-3 at 17.) Second, the Agreement requires AT&T to cooperate with Class Counsel in the event that a taxing jurisdiction denies a refund claim and Class Counsel appeal. (*Id.* at 19-20; R. 156 at 18.)

### 18.     AT&T's agreement to stop collecting taxes is not illusory

Angela Vrana and Barbara M. Fisher object to the provision in the Settlement Agreement that "AT&T Mobility reserves the right to reinstate charging for Internet Taxes in the Taxing Jurisdictions if . . . federal, state or local laws, statutes, regulations, administrative decisions or pronouncements, or the interpretation of any of the foregoing specifically requires, authorizes or permits the collection and payment of Internet Taxes[.]" (R. 143 at 9-10.) Vrana and Fisher worry that AT&T could reinstate charges for Internet Taxes at any time because its official position remains that its prior collections did not violate the law. (*Id.* at 10.) Karen Wiand echoes this objection. (R. 116 at 1-2.)

The Court does not share their concern. As part of the Settlement, AT&T expressly "agrees to cease charging the challenged Internet Taxes . . . as soon as practicable." (R. 50-3 at

15.)  In fact, as of February 23, 2011, AT&T had stopped charging these taxes in all jurisdictions, with the exception of 16 or fewer local Nevada jurisdictions and a single Missouri jurisdiction, for which the company continued to charge Internet-access taxes due to a programming error.  (R. 156 at 21-22.)  The provision that permits Defendant to reinstate this practice addresses a possible situation in which a change in the law explicitly allows the collection of such taxes.  As the Court previously noted, "[i]f a jurisdiction were to give AT&T the express authority to collect these taxes, it would be difficult to fault AT&T for resuming such taxation."  (R. 97 at 23.)

The objectors essentially fear bad faith on AT&T's part.  The Court discerns no basis for assuming the same.  As Defendant notes, "the provision does not allow AT&T to issue its own interpretations of the applicable laws as a pretext for resuming collection of the fees. . . . In any event . . . the Court retains jurisdiction to deal with 'any dispute or controversies arising with respect to the interpretation, enforcement, or implementation' of the agreement.  Thus, if . . . AT&T were to resume collection of the challenged taxes in bad faith, this Court could readily put a stop to such behavior."  (R. 156 at 50-51) (emphasis and citations omitted.)  The Court agrees.  The Settlement Agreement provides that "Class Plaintiffs and Interim Settlement Class Counsel will seek dismissal without prejudice for the limited purpose of allowing the Court to retain jurisdiction to enforce the terms of the Agreement."  (R. 50-3 at 26-27.)

### 19. There is no force to the objection that, because AT&T improperly collected taxes, it must reimburse Class Members

Another objection is that AT&T is the entity that wrongfully collected the relevant taxes and should thus bear the responsibility for making the Class Members whole.  (R. 132 at 3; R. 147 at 2.)  These objectors mistakenly assume that no conceivable question exists as to

Defendant's liability. As explained above, AT&T had a number of potentially meritorious defenses. Consistent with the compromise that defines any settlement, the Agreement observes Plaintiffs' allegations and Defendant's denial of the same, and imposes a variety of obligations on the parties. One of the conditions is that AT&T agree not to assert its defenses. (R. 50-3 at 13.)

The objectors' contention that AT&T should directly pay Class Members treats the Settlement as equivalent to a complete victory on the merits for Plaintiffs at trial. This fundamentally misconceives the nature of a settlement. Indeed, the Settlement Agreement makes clear that AT&T specifically denies all liability to the Class Plaintiffs and the Settlement Class, and further provides that, "[b]y entering into this Agreement, the Settling Parties agree that AT&T Mobility is not admitting any liability to the Class Plaintiffs, the Settlement Class, or any other person or entity, and AT&T Mobility expressly denies all such liability." (R. 50-3 at 13-14.)

### 20. State statutes of limitations do not warrant denying approval to the Agreement

Karen Wiand objects to the Settlement on the ground that "[v]arious states . . . have tax law statute of limitation [*sic*] bars preventing recovery of the tax refunds back to 2005 represented by settlement counsel as the promised refund consideration time period." (R. 116 at 1.) Citing a Michigan law that provides that "a claim for refund based upon the validity of a tax law based on the laws or constitution of the United States or the state constitution of 1963 shall not be paid unless the claim is filed within 90 days after the date set for filing a return," she explains that Michigan law would bar recoveries "for anything farther back than the most recent 90 days[.]" (*Id.* at 6-7.) Wiand argues that this creates a cross-subsidization problem because

those Class Members who would otherwise have a right to a complete refund under the operative

statute of limitations would "have their refunds pooled into a common pot with all other

Michigan consumers, including those whose service was solely in the early years of the

settlement time frame whose claims would otherwise be partially or totally time barred[.]" (*Id.*

at 7.)  As a solution, Wiand submits that "[t]he class for each state should be defined

commensurate with the applicable statute of limitations time period[.]" (*Id.* at 8.)

Finally, Wiand observes that Michigan is not the only state that will create cross-

subsidization problems.  (*Id.* at 8-9.)  She points to an Illinois law that provides that, with respect

to "any claim for credit or refund . . ., no amounts erroneously paid more than three years prior to

such January 1 and July 1, respectively, shall be credited or refunded[.]"  35 ILL. COMP. STAT.

630/10.  As a result, she submits, "the Illinois class . . ., like the Michigan class, would receive

far less than identically situated class members in states without short refund statutes of

limitations (a blatant inter-state conflict of interest); and the 100% valid claims of recent

consumers would be diluted in order to pay refunds on expired invalid time-barred claims of

other consumers[.]" (*Id.* at 8-9.)  Objector Shelley Stevens make a similar point.  (R. 151 at 2

(objecting to the Agreement because "the laws of the states are different" and "some states [*sic*]

refunds may be barred by limitations").

The Court disagrees with these objections.  In the first place, the argument that different

states' varying statutes of limitations create an inter-state conflict of interest fails in light of the

fact that the Settlement Agreement creates distinct state-specific subclasses and separate local

representation.  (R. 156 at 49.)  Second, the 90-day provision of Michigan law on which Wiand

relies does not apply when a person files a refund claim with respect to taxes that violate state

law.  MICH. COMP. LAWS § 205.27a(2).  As AT&T explains, "the basis of the refund claim filed in Michigan is that Michigan law does not authorize the challenged taxes[.]"  (R. 156 at 46) (emphasis omitted.)  Last, Wiand's cross-subsidization objection does not support subdividing the Subclasses into additional subclasses based on statutes of limitations because such an arrangement would be unworkable.  *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. GMC*, 497 F.3d 615, 629 (6th Cir. 2007) ("[I]f every distinction drawn . . . by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair.").  Furthermore, and with respect to objectors' cross-subsidization concern, "there is no rule that settlements benefit all class members equally . . . as long as the settlement terms are 'rationally based on legitimate considerations.'"  *UAW v. Gen. Motors Corp.*, No. 05-CV-73991, 2006 WL 891151, at *28 (E.D. Mich. Mar. 31, 2006) (quoting *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y. 1997)).  In the present case, the Settlement will provide the Class Members with significant benefits.

### 21.    The Agreement Does Not Improperly Saddle the Class Members with the Administration Costs and Attorneys' Fees

Karen Wiand also objects that the Agreement saddles the "class member victims of AT&T's illegal breach of contract . . . with settlement administration costs and attorney fees." (R. 116 at 2.)  This objection misconstrues the legal status of the parties' conduct.  There has been no finding that AT&T violated the law.  Nor has this, or any other, Court found AT&T liable to the Class Members for Defendant's collection of the challenged tax charges.  The Settlement Agreement currently before the Court does not constitute an admission of liability or any violation of the law on AT&T's part, but instead preserves the parties' conflicting positions

75

on this matter. (R. 50-3 at 10.) As explained above, given the legal issues involved, it is not certain that Plaintiffs would prevail at trial should the Court elect not to approve the Settlement.

The Agreement provides that the "Cost of Administration shall be paid from the Settlement Fund prior to distribution of the Net Settlement Fund." (R. 50-3 at 29.) The fact that the parties will use refunds to pay for the settlement administration costs and attorneys' fees, however, does not defeat the legitimacy of the Settlement. *See, e.g.*, *In re PaineWebber*, 171 F.R.D. at 131 ("Naturally, the settlement does not provide for a full recovery of legal damages; but that is the hallmark of compromise. Given the very considerable litigation risks that would be faced by the Class at trial, the amount of the settlement cash fund is very much within the 'range of reasonableness' required for judicial approval."). For the reasons outlined above, the Court finds that the Settlement meets the requirements of Rule 23.

### 22. Class counsel have established a well-thought-out procedure for obtaining refunds in Michigan

Karen Wiand next objects that the Settlement fails to establish a procedure for proposed tax refunds for Michigan residents. (R. 116 at 3.) To the contrary, the Agreement puts in place a methodology for obtaining refunds from the various states that have differing rules with respect to the same. Wiand's objection as to Michigan is misplaced. Indeed, AT&T has already submitted a refund claim in that jurisdiction. (R. 156 at 51.)

### 23. It is appropriate for the Michigan law firm to work with Class Counsel

Karen Wiand also objects that Class Counsel purport to represent Michigan class members "via a co-counsel Michigan law firm in which one of the two partners of the firm recently testified as an 'expert' at the request of AT&T Mobility in support of its motion to

dismiss a similar consumer lawsuit." (R. 116 at 4.) The partner to whom Wiand refers is

Wolfgang Mueller, who submitted an affidavit on behalf of AT&T in a separate case to the effect

that AT&T's "arbitration provision would not prevent a plaintiff from obtaining competent

counsel to represent him or her on an individual case basis." (R. 116-2 at 1-4.) The Court did

not consider this prosaic detail to be a creditable objection in its earlier opinion, which granted

preliminary approval. (R. 97 at 14 n.14.) Wiand does not now explain why this affidavit reveals

that the Michigan law firm is ill placed to work with Class Counsel. (R. 116 at 4.) This

objection is not well founded.

### 24.    The strength of Plaintiffs' case supports the Settlement

Margaret Strohlein objects that, "[a]lthough Class Counsel claims the strength of

Plaintiffs' causes of action were tenuous, the short life cycle of the case coupled with the, almost

immediate, settlement for both monetary and injunctive relief indicates otherwise." (R. 156-4 at

3.) She further submits that AT&T's "seemingly overt violations of the ITFA make Lead

Counsels' pleas after the fact seem hollow." (*Id.* at 4.) The Court does not agree. As explained

above, Defendant has a number of potentially effective defenses to the instant action, which

could deny the Class Members much or all of their sought-after relief. The Settlement

Agreement, by contrast, promises to yield significant benefits to the Class Members. Viewed in

light of the strength of Plaintiffs' case, the Agreement is fair, reasonable, and adequate.

Strohlein also objects that "there is no guarantee what [Class Members'] reward will be."

(R. 156-4 at 5-6.) Of course, no guarantee exists that Class Members would recover should they

proceed in this MDL litigation and, if they did, in what amount. There is evidence, however,

that AT&T's agreement to discontinue the collection of the challenged taxes pursuant to the

Settlement will benefit the Class Members. Dr. Landes estimates this value as being close to $2 billion. (R. 163-2; Tr. at 36.) Although this figure exaggerates the Agreement-specific gains to the Class from AT&T's no longer charging Internet-access taxes, the benefits are nevertheless real.[11] Further, as of February 23, 2011, AT&T had stopped charging these taxes in all jurisdictions, with the exception of 16 or fewer local Nevada jurisdictions and a single Missouri jurisdiction, for which the company continued to charge Internet-access taxes due to a programming error. (R. 156 at 21-22.). While the parties cannot predict the amount in cash refunds that Class Counsel will realize for the Class Members with mathematical precision, the fact that Counsel's compensation is tied to that recovery creates a strong incentive for them to maximize the value of the return. Given the powerful benefits likely to result from the Settlement, Strohlein's objection is unconvincing.

### 25. Challenges to Dr. Landes's methodology do not warrant denying approval to the Settlement

Margaret Strohlein challenges Dr. Landes's methodology and questions the reliability of her conclusions on the basis of bias. (R. 156-4 at 2, 9-11.) She first submits that Dr. Landes's calculation of a 3.09% tax rate common to the Class is "speculative" and "beyond vague." (*Id.* at 10.) The Court does not agree. Dr. Landes is a highly experienced economist with impressive credentials. She has worked at Lexecon—a leading economics-consultancy firm—for 30 years and has a doctorate in economics from Columbia University. (R. 163-2 at 1; Tr. at 9.) At the March 10, 2011, hearing, and in her report, Dr. Landes carefully and credibly explained her

---

[11] As explained above, one must discount the $1.98 billion value estimated by Dr. Landes by reference to the probability that AT&T would have elected to cease collecting the relevant taxes in the absence of the Agreement.

methodology. Dr. Landes relied "on the ratio of the total taxes collected to AT&T's total data service revenues for the first half of 2010 to estimate the fraction of revenues that would have been collected as taxes in the future, in the absence of the Settlement" in arriving at the 3.09% average tax rate. (R. 163-2 at 4; Tr. at 28.)

Strohlein argues, first, that Dr. Landes "only utilized the total data service revenues for the first half of 2010 in determining the tax rate instead of a larger temporal cross section." (R. 156-4 at 10.) Strohlein does not offer a view based in economics, or otherwise, why this half-year measure was improper or was apt to give rise to a misleading calculation. (*Id.*) Furthermore, Dr. Landes subsequently testified at the March 10, 2011, hearing that she had updated her conclusions in light of AT&T's fourth-quarter earnings report. (Tr. at 12-16 (observing that "AT&T's actual fourth quarter financial results, particularly for data services, came in somewhat under the analyst projections").)

Strohlein's second objection is that Dr. Landes "utilized an average of all of the state's [*sic*] and jurisdiction's [*sic*] tax rates (instead of calculating each jurisdiction separately) in order to obtain her rate of 3.09." (R. 156-4 at 10.) Yet, at the March 10, 2011, hearing Dr. Landes explained that she had "thought about trying to get into the very varied details of the state tax collections and the members of the class that are state by state" because "the states have different tax rates and different numbers of persons in the class[.]" (Tr. at 13.) She then explained that that would not have been an effective course because it would be very difficult to do and "would lead to a sense of false precision." (*Id.*) The Court finds Dr. Landes's explanation to be convincing and credits it, accordingly.

Finally, Strohlein challenges Dr. Landes's calculation of the relevant discount rate. (R. 156-4 at 10-11.) Strohlein does so despite conceding that "Dr. Landes employed a method commonly utilized in the field of economics for this purpose[.]" (*Id.* at 10.) Observing that, "because AT&T's debt is not publicly traded, Dr. Landes was unable to access any information on its current debt rate," Strohlein criticized Dr. Landes for relying "on the yield on an index of U.S. bonds with short term maturities (1 - 5 years) issued by utilities and phone companies." (*Id.* at 11.) Strohlein offers no explanation why such an index is not a reasonable and acceptable proxy for AT&T's discount rate. In fact, Dr. Landes credibly testified that it is standard for economics experts to rely on such information.

With a single qualification, the Court is convinced by Dr. Landes's thorough report and testimony, and thus overrules Strohlein's objection. As noted, the Court accepts Dr. Landes's estimate of the value to the Class Members of AT&T's decision to cease collecting Internet-access taxes. This estimate, however, overstates the value that the Settlement specifically creates for the Class because there is at least some chance that AT&T would have ceased collecting those taxes independent of the Agreement.

### 26. The objection to class actions generally is misplaced

Lastly, Robert Shattuck launches a sustained critique of the class-action device generally. (R. 156-5.) It is true that at least some forms of class-action practice have attracted criticism. *See, e.g.*, *In re Am. Exp. Merchants' Litig.*, 554 F.3d 300, 304 n.3 (2d Cir. 2009), *vacated by Am. Exp. Co. v. Italian Colors Rest.*, 130 S. Ct. 2401 (2010). Yet, the law recognizes class actions as a legitimate part of the U.S. litigation system. The Supreme Court has made this clear on several occasions. *See, e.g.*, *General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982) (explaining that, in

appropriate cases, "the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23"); *Deposit Guaranty Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."). In addition, Federal Rule of Civil Procedure 23 provides for the use of such a procedure.

The only specific feature of the Settlement Agreement presently before the Court that Shattuck addresses is his argument that the Court should limit attorneys' fees to $100,000. (R. 156-5 at 9.) Shattuck's suggestion of a $100,000 cap appears arbitrary because, beyond opining that large attorneys' fees will invite an excessive number of class-action lawsuits, he does not explain how he reaches that figure. In addition, as Mr. Robertson testified at the fairness hearing, Class Counsel already have expended approximately $1 million in out-of-pocket expenses in litigating this case.[12]

## B. The Amicus Briefs Filed by Certain States Do Not Change the Fact that the Settlement Is Fair, Reasonable, and Adequate

The Court has carefully studied the amicus briefs filed by several states, and concludes that those states' concerns do not warrant a finding that the Settlement Agreement is not fair, reasonable, and adequate.

A recurring concern involves the perception that the Court, in approving the Agreement, is affirmatively holding that the relevant taxing jurisdictions must grant the parties' refund

---

[12] The Court rules on Class Counsel's motion for attorneys' fees in an accompanying memorandum opinion and order.

requests.  The Court makes no such finding.  The Settlement is an agreement that, once approved by this Opinion, will only bind the private parties that are privy to it.  The Settlement does not purport to dictate to any state or local authority the makeup of its applicable law.

Texas objects that, in approving the Settlement, the Court would be granting "an injunction against AT&T [*sic*] collecting state sales taxes on Internet access charges in Texas[.]" (R. 178 at 12.)  To the contrary, nothing in the Agreement calls on the Court to award an injunction under Federal Rule of Civil Procedure 65.  Nor shall the Court do so.  The Settlement amounts to no more than an agreement, enforceable in contract, that AT&T will cease charging the relevant taxes.  Contrary to what Texas maintains, the Agreement does not "confer power on this Court to excuse AT&T from its duties under Texas law." (*Id.* at 13.)  In the event that a state court determines, or a legislature provides, that AT&T's failure to collect Internet-access taxes is contrary to law, the Settlement does not require AT&T to refrain from collecting those taxes, whether it be in Texas or any other jurisdiction.  Indeed, the Agreement provides that AT&T reserves the right to reinstate charging for Internet Taxes if "federal, state or local laws, statutes, regulations, administrative decisions or pronouncements, or the interpretation of any of the foregoing specifically requires, authorizes or permits the collection and payment of Internet Taxes on, or on the charges for, any services or products set forth on Exhibit I." (R. 50-3 at 15.)

A further objection raised by amici is that the ITFA does not apply to AT&T's activities in certain states because of the Act's grandfather provision.  (R. 178 at 9.)  This issue is not before the Court.  Should amici take the position that their laws do not entitle the parties to a refund, then it will be for the legal processes of their respective states to determine whether the

law justifies that position.  Importantly, the Settlement provides for an appellate procedure in the event that jurisdictions refuse to grant refunds.  (R. 50-3 at 19.)

Texas also argues that, because in its view the ITFA does not apply to AT&T's collection of sales taxes from the company's Texas customers, "[u]nder the Settlement Agreement[,] each member of the Texas Subclass is likely to receive a zero recovery while forfeiting possibly valid claims under a broad release of AT&T."  (R. 178 at 9, 21-24.)  If Texas is correct that the law justified AT&T's collection, however, it does not explain what claims the Class Members could pursue against AT&T if the release under the instant Settlement did not apply to them. Ultimately, the Court is satisfied that the aggregate expected value to Class Members under the Settlement significantly exceeds their expected value in either proceeding to trial or undertaking arbitration on an individual basis.

Amici also argue that the Tax Injunction Act deprives the Court of subject-matter jurisdiction both to entertain the present MDL and to approve the Settlement Agreement.  (R. 171; R. 178; R. 179.)  The TIA provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  The Seventh Circuit has explained that, "if the relief sought would diminish or encumber state tax revenue, then the Act bars federal jurisdiction over claims seeking such relief.  The TIA strips the district courts of the power to hear suits seeking not only injunctive but also declaratory relief from state taxes." *Scott Air Force Base Props, L.L.C. v. Cnty. of St. Clair*, 548 F.3d 516, 521 (7th Cir. 2008) (citing *Levy v. Papas*, 510 F.3d 755, 762 (7th Cir. 2007); *see also Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323, 2332 (2010) ("[T]he TIA may be best understood as but a partial codification of the

federal reluctance to interfere with state taxation. . . . The Act . . . restrained state taxpayers from instituting federal actions to contest their own liability for state taxes, suits that, if successful, would deplete state coffers. . . . Federal judges . . . are bound by the TIA; absent certain exceptions, the Act precludes relief that would diminish state revenues[.]") (quotations omitted).

Amici argue that the Settlement, if approved by the Court, would enjoin the collection of a tax in circumstances where state courts provide for a plain, speedy, and efficient remedy. (R. 171; R. 178; R. 179.) This argument misconceives both the nature of the Settlement and this Court's approval of the same. As stated above, the Court's approving the Settlement does not constitute an injunction against a state tax. The Settlement amounts only to an agreement between private parties, pursuant to which a private company agrees to cease collecting a particular tax. Furthermore, in carrying out the provisions of the Agreement that require the parties to seek refunds from taxing jurisdictions, the Settlement does not purport to dictate to any state the substance of its laws. Indeed, the Agreement provides that, if any "state or local laws, statutes, regulations, administrative decisions, or pronouncements . . . authorizes [*sic*] or permits [*sic*] the collection and payment of Internet Taxes[,]" AT&T may reinstate charging for Internet taxes. (R. 50-3 at 15.) In addition, if a taxing jurisdiction declines a refund, the parties cannot turn to this Court for an order compelling that jurisdiction to issue the same. (*Id.* at *passim*.) Instead, the Agreement provides for an appeal process within the relevant state or local jurisdiction that denied the refund. (*Id.* at 19.)

Finally, the Court does not agree with amici that it lacked jurisdiction to entertain this MDL because the consolidated master class-action complaint sought, amongst other remedies, injunctive relief. (R. 48 at 27-28.) In the first place, the JPML transferred the instant MDL to

this Court "for coordinated or consolidated *pretrial* proceedings" only. (R. 1 at 3) (emphasis

added.) Further, it is not clear that relief awarded between private parties could fall afoul of the

TIA. As the Seventh Circuit recently observed, "[w]e fail to see how a suit against a private

party could challenge the validity of a tax, given that private parties do not have the power of

taxation. We have not found another case where the parties even argued, let alone the court

agreed, that the TIA prevented a private dispute from being adjudicated in federal court." *In re

Wal-Mart Stores, Inc.*, No. 09-8039, 2009 WL 7823752, at *1 (7th Cir. Nov. 12, 2009). Finally,

the Settlement does not provide for injunctive relief, and so any defect in the underlying

complaint does not afflict the propriety of the ultimate Agreement disposing of the MDL. *See,

e.g.*, *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 64 (1996) ("We hold that a district court's error in

failing to remand a case improperly removed is not fatal to the ensuing adjudication if federal

jurisdictional requirements are met at the time judgment is entered").

**III.    The Court Can Approve the Settlement Agreement Without Granting in its Entirety
Class Counsel's Motion for Attorneys' Fees, Costs and Expenses, and for Approval
of Incentive Awards for Class Representatives**

For the reasons explained above, the Settlement Agreement is fair, reasonable, and

adequate, and thus the Court grants the motion for final approval (R. 154). In an accompanying,

but separate order, the Court grants in part and denies in part Class Counsel's motion for

attorneys' fees, costs and expenses, and for approval of incentive awards for Class

Representatives. The Court can consistently approve the Settlement Agreement, finding it to be

fair, reasonable, and adequate, while also finding that the requested attorneys' fee is

unreasonable. *See, e.g.*, *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844 (5th Cir. 1998)

(finding that the district court, having approved the amended settlement agreement, did not abuse

its discretion in denying additional attorneys' fees in a class action); *In re Elan Secs. Litig.*, 385 F. Supp. 2d 363 (S.D.N.Y. 2005) (finding proposed settlement to be reasonable, and thus granting motion for approval, but reducing sought attorneys' fee from requested 20% of settlement amount to 12%, and so granting motion for fees in part); *In re Twinlab Corp. Secs. Litig.*, 187 F. Supp. 2d 80 (E.D.N.Y. 2002) (approving settlement, and finding an attorney-fee award of 12% of the common fund, but not the requested 33% fee, to be reasonable); *cf. In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) (finding that the district court did not abuse its discretion in approving a class-action settlement, reversing the court's award of attorneys' fees "at a level significantly below what the lawyers had requested" because the court had failed to estimate the market rate for such fees, but not suggesting that district courts cannot legitimately approve class-action settlements while at the same time awarding less than the sought attorneys' fees).

In the present case, the Settlement Agreement is not contingent on the Court's approving Class Counsel's motion for attorneys' fees. (R. 50-3.) The Settlement merely provides that "Class Counsel agree that they will seek a fee no greater than the lesser of ten percent (10%) of the aggregate value of the settlement or twenty-five percent (25%) of the amounts refunded by Taking Jurisdictions to the Settlement Class." (*Id.* at 26.) Class Counsel have sought such a fee. The Agreement does not require that Class Counsel succeed in obtaining the fee that they seek.[13]

---

[13] The Agreement provides that, if the Court does not approve the Settlement "in complete accordance" with its terms, "no class will be deemed certified." (*Id.* at 25-26.) It further states that, AT&T shall have the right to set aside or rescind the Agreement "[i]f any objections to the proposed settlement are sustained" or "[i]f there are any material modifications to this Agreement, including exhibits, by the Court[.]" (*Id.* at 30-31.) It also provides that a "final order" or "final judgment" cannot occur unless the Court approves the Settlement "without material modification unless expressly agreed to by AT&T Mobility and the Class Plaintiffs[.]"

The Court can therefore grant final approval to the Settlement Agreement, while denying in part Class Counsel's sought-after attorneys' fee. *Cf. Reibstein v. Rite Aid Corp.*, -- F. Supp. --, 2011 WL 192512, at *3 (E.D. Pa. Jan. 18, 2011) (observing that the relevant settlement agreement provided that "a reduction by the Court . . . of attorneys' fees . . . sought by the Plaintiff and Class Counsel shall not affect any of the parties' other rights and obligations under this Settlement Agreement"). This interpretation comports with the statements of Class Counsel, who at the fairness hearing explicitly requested a separate fee order if the Court approved the Settlement—the "merits part of it"—to facilitate a possible appeal on the issue of fees.

The Court therefore grants the motion for final approval of the Settlement (R. 154).

## CONCLUSION

For these reasons, the Court grants the Motion for Final Approval of the Settlement (R. 154).


Dated: June 2, 2011

ENTERED

**AMY J. ST. EVE**
**United States District Court Judge**

---

(*Id.* at 9.) As explained, however, in denying in part Class Counsel's motion for attorneys' fees, the Court does not modify any provision of the Settlement, be it materially or otherwise.